1  STROOCK & STROOCK & LAVAN LLP
   JOHN M. GATTI (State Bar No. 138492)
2  *jgatti@stroock.com*
   GLORIA Y. CHANG (State Bar No. 252390)
3  *gchang@stroock.com*
   2029 Century Park East
4  Los Angeles, CA  90067-3086
   Telephone: 310-556-5800
5  Facsimile: 310-556-5959
   Email: *lacalendar@stroock.com*
6
7
8  Attorneys for Defendants
     INFERNO DISTRIBUTION, LLC and
9    INFERNO INTERNATIONAL, LLC

10          **UNITED STATES DISTRICT COURT**

11          **CENTRAL DISTRICT OF CALIFORNIA**

12

13  Cinezeta Internationale            )   Case No. CV10-9938 JFW (FMOx)
    Filmproduktionsgesellschaft mbH &  )
14  Co 1. Beteiligungs KG,             )   [The Honorable John F. Walter]
                                       )
15              Plaintiff,             )
                                       )   **DEFENDANTS INFERNO**
16         vs.                         )   **DISTRIBUTION, LLC AND**
                                       )   **INFERNO INTERNATIONAL,**
17  Inferno Distribution, LLC; Inferno )   **LLC'S OPPOSITION TO**
    International, LLC; and DOES 1-10,  )   **PLAINTIFF'S MOTION FOR**
18  inclusive,                         )   **PARTIAL SUMMARY JUDGMENT**
                                       )
19                                     )   Date: October 17, 2011
              Defendants.             )   Time: 1:30 p.m.
20                                     )
                                       )   Action Filed:  December 27, 2010
21                                     )   Pretrial Conf: November 18, 2011
22                                     )   Trial Date: December 6. 2011
                                       )
23                                     )

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................. 1

II.  RELEVANT FACTS ........................................................................... 4

    A.  In 2004, Distribution And Cinezeta Enter Into The Agreements ............. 4

    B.  Service Providers Assign Cinezeta $3.6 Million In Tax Credits ............. 5

    C.  Delivery Pursuant To The Agreements Is Not Satisfied ......................... 5

    D.  Cinezeta Authorizes Service Providers To Receive Tax Credits
       And Service Providers Use Tax Credits As Security For A Loan .......... 6

    E.  Cinezeta Has Received Over $4.2 Million From The Collection
       Account ......................................................................................... 7

    F.  International Was Formed To Start New Projects .................................. 7

    G.  Cinezeta Waits Until December 2010 To Give Written Notice ............... 8

III.  ARGUMENT .................................................................................... 9

    A.  Cinezeta Is Not Entitled To Judgment As A Matter Of Law ................. 9

        1.  Cinezeta Failed To Perform Under The Agreements ..................... 9

        2.  Distribution Has Satisfied Its Obligations Under The
           Agreements ........................................................................... 12

           a.  Payments To Cinezeta Reduce The Sales Guarantee ........ 12

           b.  The Tax Credits Rights Reduce The Sales Guarantee ....... 12

           c.  Cinezeta Willingly Gave Up The Rights To The Tax
              Credits Money And Agreed To Pay For Its Own
              Liabilities ...................................................................... 15

           d.  Cinezeta Secretly Benefitted From The Tax Credits ........ 16

        3.  Cinezeta's Claim Is Premature ............................................... 17

        4.  Any Ambiguity Should Be Construed Against Cinezeta ............. 19

        5.  Cinezeta's Interest Argument Fails ......................................... 20

    B.  Cinezeta Cannot Establish A Claim Of Alter Ego .............................. 21

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1.    International Is Not The Alter Ego Of Distribution .....................21

        a.    International Is A Distinct Corporate Entity ......................22

        b.    Failure To Pierce The Corporate Veil Would Not
              Sanction a Fraud Or Promote Injustice .............................23

IV.    CONCLUSION ...........................................................................25

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

CASES

4

Airlines Reporting Corp. v. United States Fid. & Guar. Co.,
   31 Cal. App. 4th 1458.........................................................................................9, 18

Baize v. Eastridge,
   142 Cal. App. 4th 293 (2006)...................................................................................25

Bowoto v. Chevron Texaco Corp.,
   312 F. Supp. 2d 1229 (N.D. Cal. 2004)...................................................................25

Dong AH Tire & Rubber Co., Ltd v. Glasforms, Inc.,
   2009 WL 975817 (N.D. Cal. Apr. 10, 2009)...........................................................25

Elliano v. Assurance Co. of America,
   45 Cal. App. 3d 170 (1975).....................................................................................21

Flynt Distributing Co., Inc. v. Harvey,
   734 F. 2d 1389 (9th Cir. 1984)................................................................................22

Leiter v. Eltinge,
   246 Cal. App. 2d 306...............................................................................................18

McLaughlin v. L. Bloom Sons Co., Inc.,
   206 Cal. App. 2d 848 (1962)...................................................................................25

Mid-Century Ins. Co. v. Gardener,
   9 Cal. App. 4th 1205................................................................................................22

Parsons v. Bristol Development Co.,
   62 Cal.2d 861..............................................................................................................9

Playboy Enters., Inc. v. Welles,
   279 F.3d 796 (9th Cir. 2002)..............................................................................21, 23

Smith v. Royal Mfg. Co.,
   185 Cal. App. 2d 315, 8 Cal. Rptr. 417 (1960) ........................................................9

Sonora Diamond Corp. v. Superior Court,
   83 Cal. App. 4th 523, 99 Cal. Rptr. 2d 824 (2000) ...............................................21

Wady v. Provident Life & Accident Ins. Co
   216 F. Supp. 2d 1006 (C.D. Cal. 2002)..................................................................21

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

LA 51462435

Walsh v. W. Valley Mission Community College District,
     66 Cal. App. 4th 1532 (1998) ................................................................................. 20

Webber v. Inland Empire Invs.,
     74 Cal. App. 4th 884 ..................................................................................... 21, 22

**STATUTES**

Cal. Civ. Code § 1636 ........................................................................................... 9, 14

Cal. Civ. Code § 1638 ......................................................................................... 14, 17

Cal. Civ. Code § 1649 ............................................................................................... 19

Cal. Civ. Code § 1656 ............................................................................................... 17

Cal. Civ. Code § 2837 ................................................................................................. 9

Cal. Code Civ. Proc. § 3287 (a) ............................................................................... 21

Cal. Code Civ. Proc. § 3287 (a), (b) ........................................................................ 21

Fed. R. Civ. Proc. 56 ................................................................................................... 9

44 Cal. Rptr. 767 (1965) ............................................................................................. 9

37 Cal. Rptr. 2d 563 (1995) .................................................................................. 9, 18

54 Cal. Rptr. 703 (1966) ........................................................................................... 18

88 Cal. Rptr. 2d 594 (1999) ...................................................................................... 21

11 Cal. Rptr. 2d 918 (1992) ...................................................................................... 22

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
LA 51462435

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff Cinezeta's breach of contract claim against Defendants Inferno Distribution, LLC ("Distribution") and Inferno International, LLC ("International" and collectively, "Defendants") fails as a matter of law.  Cinezeta claims that Distribution breached the Production Guarantee Agreement ("PGA") and the Sales Agency Agreement ("SAA" and collectively, the "Agreements") by failing to pay any portion of the PGA's Sales Guarantee by January 10, 2008.  Cinezeta, however, cannot point to anywhere in the PGA where it provides that Distribution is obligated to pay the Sales Guarantee by January 10, 2008.  Rather, as explicitly provided for in the PGA, the January 10, 2008 serves as the date on which Cinezeta's option to cancel the SAA arises if Distribution fails to pay the Sales Guarantee by that date.  (Defendants' Fact ("DF") 133-134.)  Cinezeta, however, does not even have the option to cancel the SAA because, as set forth below, Distribution has long since performed its obligations under the Guarantee provision of the PGA.

While Cinezeta falsely alleges in its Complaint that it has suffered damages "in no event less than the amount of the Sales Guarantee (*viz.,* $7,694, 100) plus interest[,]" Cinezeta now concedes that the Sales Guarantee has been reduced by Cinezeta's receipt of $4,266,182.56 from the Picture's collection account.  (Cinezeta's Fact ("CF") 49.)  Cinezeta, however, still refuses to recognize that its irrevocable right to $3,600,000 from the tax credits reduced the Sales Guarantee to $0.  While Cinezeta acknowledges that it received the right to the tax credits and that the Canadian government issued the entirety of the tax credits (CF 34, DF 195), it claims that Distribution should be liable to pay $3,427,917.44 because the production service providers ("Service Providers"), whom Cinezeta admits it selected, hired, and controlled, stole the tax credits.  Cinezeta's argument fails for several reasons.

First, the explicit language of the PGA's "Guarantee" section provides that the tax credits shall be payable directly to Cinezeta – not the Service Providers – and

LA 51462435

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1  provides that any payments made directly to Cinezeta shall reduce the Sales

2  Guarantee.  (DF 128.)  Moreover, the Tax Credits Assignment Agreement

3  ("Assignment" - which Cinezeta acknowledges it entered into with the Service

4  Providers) provides that Cinezeta's receipt of the <u>rights to</u> the tax credits reduces the

5  Sales Guarantee.  (CF 34, DF 159.)  Moreover, the definition of "Sales Guarantee"

6  further supports this reading, as it describes item (iii) of the Sales Guarantee as

7  "US$3,600,000 in <u>the form of</u> an irrevocable assignment" and <u>not</u> "US$3,600,000

8  <u>from an</u> irrevocable assignment."  (DF 127 (emphasis added).)  Thus, it is evident

9  from these agreements (and further supported by extrinsic evidence) that the actual

10 assignment of tax credits to Cinezeta reduced the Sales Guarantee by $3,600,000.

11 Whether or not Cinezeta in fact "cashed" the money from the tax credits, whether or

12 not it gave the money away, or whether or not someone stole the tax credits, does not

13 change the fact that the irrevocable assignment of the tax credits reduced the Sales

14 Guarantee.   Thus, even if the Service Providers absconded the money from the tax

15 credits, Cinezeta, not Distribution, would be liable for any purported loss arising

16 from the tax credits, particularly since the PGA explicitly provides that Cinezeta

17 "<u>shall at all times pay for its liabilities with its own funds which have been obtained</u>

18 <u>from its operations</u>."  (DF 137 (emphasis added).)

19       Second, Distribution could not be liable as Cinezeta breached the Agreements.

20 Cinezeta represented and warranted that it: (1) "has not entered into any agreement

21 or granted any license, security interest or other interest affecting the Picture[;]" (2)

22 the Picture's "Production Account" shall be "opened solely for the purposes of the

23 production of the Picture[;]" and (3) Cinezeta "shall not commingle its funds and

24 other assets with those of any other entity or person[.]" (DF 140, 142.)  In complete

25 disregard of these representations and covenants, Cinezeta, without informing

26 Distribution, gave the rights to the tax credits to the Service Providers, such that the

27 tax credits were no longer directly payable to Cinezeta.  Further, Cinezeta gave up

28 the rights to the tax credits in exchange for the monetary equivalent when it entered

-2-

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1   into a settlement agreement with the Service Providers in 2007 (D 191) – again

2   without Distribution's knowledge.  Moreover, Cinezeta's own managing director at

3   the time, Eberhard Kayser, authorized that at least $2 million from the tax credits be

4   used for another production managed by Cinerenta, Cinezeta's former general

5   partner, and which had nothing to do with Distribution.  (DF 185-189.)  Simply put,

6   the PGA does not provide that Distribution is liable to pay for the cash value of the

7   tax credits when Distribution, unlike Cinezeta, had no control over the tax credits and

8   where Cinezeta voluntarily gave up its rights to them, mismanaged them, and then

9   still reaped the benefits of the tax credits.  Such an absurd reading essentially would

10   allow Cinezeta to give away or refuse the money from the tax credits, and thereafter

11   allow it to recover the money from Distribution by claiming that it never actually

12   "cashed" the tax credits.  The parties clearly did not intend for such a result.

13       Third, Cinezeta's argument fails because Cinezeta never delivered the Picture

14   to Distribution in accordance with the Relevant Agreements, as was necessary to

15   trigger the Sales Guarantee provision.  (DF 165-175.)  As made evident in the

16   Declaration of James Seibel (Distribution's principal) and correspondence between

17   Distribution and Cinezeta's representatives, Cinezeta never contractually delivered

18   the Picture to Distribution, and, as a result, Distribution incurred problems with sub-

19   distributors and potential buyers.  (DF 171, 176.)  The mere fact that the Picture was

20   released and sold does not mean that Distribution received all of the elements

21   necessary for "Delivery" to be satisfied under the Agreements.  "Delivery" has a

22   very specific meaning under the SAA (DF 168 ) – and such Delivery did not occur in

23   breach of Cinezeta's agreements with Distribution.

24       If the Sales Guarantee was in fact due on January 10, 2008 and if, as Cinezeta

25   erroneously claims, Distribution failed to satisfy the Sales Guarantee, then surely

26   Cinezeta would not have authorized sales commissions to Distribution as late as

27   March 2009 (DF 209), would not have waited until December 14, 2010 to give

28   Distribution written notice of its purported breach under the PGA (DF 218 ), and

-3-

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1  would not have waited almost three years before filing suit, in December 27, 2010

2  (DF 223).  Thus, Cinezeta's conduct supports the fact that Distribution satisfied its

3  obligations under the PGA and the Sales Guarantee was not due on January 10, 2008.

4  Even more outrageous is Cinezeta's alter ego claim.  Cinezeta's allegations, at

5  most, show that Distribution and International are companies that share some

6  resources in an effort to save costs.  What Cinezeta pays little to no credence to is

7  that Distribution and International are distinct legal entities with distinct articles of

8  incorporation and operating agreements, that they have distinct bank accounts at

9  different banks, that they have separate assets and rights in different films which are

10  kept separate, that they have different employees, that they engage in different types

11  of business, that that they do not have all of the same managers and members, that

12  they keep separate financial records and ledgers and file separate tax returns.  (DF

13  251-266.)  As such, Cinezeta has far from met its burden of establishing that

14  International is the alter ego of Distribution.  Moreover, Cinezeta has not offered a

15  scintilla of evidence showing that failure to pierce the corporate veil would result in

16  injustice to Cinezeta.  Accordingly, Defendants respectfully request that the Court

17  deny Cinezeta's Motion for Partial Summary Judgment ("Motion").

18  ## II.    RELEVANT FACTS

19  ### A.    In 2004, Distribution And Cinezeta Enter Into The Agreements

20  In late 2004, Distribution, First Look Media (together, "Sales Agent") and

21  Cinezeta entered into the Agreements regarding the Picture.  (DF 124.)  Pursuant to

22  these Agreements, Cinezeta agreed to produce, finance and deliver the Picture.  (DF

23  125.)  Distribution was granted the exclusive right to act as Sales Agent to distribute

24  the Picture in certain foreign territories.  (DF 126.)  In addition, subject to certain

25  conditions, Distribution agreed to pay a "Sales Guarantee" that was "subject to the

26  production and delivery of the Picture to Sales Agent in accordance with the

27  Relevant Agreements."  (DF 127.)  The Guarantee section of the PGA provides in

28  part that "[a]ll parties hereby agree that KG is the sole beneficiary of the tax credits

-4-

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1  and that the tax credits shall be payable directly [Cinezeta] rather than the Collection

2  Account." (DF 128.) It further provides that:

> . . . the liability of Sales Agent to pay the Sales Guarantee and the amount of the Sales Guarantee shall be subject to reduction in accordance with the Approved Recoupment Schedule and subject to reduction for any amounts of the Sales Guarantee that are paid directly to [Cinezeta] rather than the Collection Account which amounts [Cinezeta] will advise the Collection Agent have been paid directly to [Cinezeta] and, as a result, should reduce the amount of the Sales Guarantee accordingly. . .

(DF 128.) International was not a party to the Agreements nor could have been. (DF 240.)

**B.   Service Providers Assign Cinezeta $3.6 Million In Tax Credits**

Mooseface Films, Inc. ("MF") and Just Friends Productions (the "Service Providers") and Cinezeta, entered into the Production Services Agreement ("PSA"), effective August 25, 2004. (DF 152.) Pursuant to the PSA, Cinezeta engaged the Service Providers "to provide all production services with respect to the Picture as independent service providers on a work-for-hire basis . . . on behalf and for the account of and under the direction and control of [Cinezeta] . . ." (DF 154.) Cinezeta designated Infinity, acting exclusively through Michael Ohoven, as the Production Advisor on the Picture. (DF 157) The Service Providers and Cinezeta also entered into an Assignment of Tax Credits Agreement (the "Assignment"), dated October 25, 2004. (CF 34; DF 158.) Distribution was not a party to any of these agreements. (DF 152, 158.) William Vince was a principal of the Service Providers and other associated companies including Infinity Features Entertainment Inc ("IFE") and Cavern Productions Limited ("Cavern"). (DF 161.) Cavern was a production service entity hired by Cinerenta (former partner of Cinezeta) for the production of Alicia's Book, a Cinerenta film that never materialized. (CF 2,3; DF 164.)

**C.   Delivery Pursuant To The Agreements Is Not Satisfied**

Distribution never received a copy of, nor was made party to, a Completion Guaranty[1] specifying, defining, and insuring the manner of Delivery to Distribution.

---

[1] A Completion Guaranty is a form of insurance offered by a completion guarantor to guarantee that the producer will complete and deliver the film to the listed parties.

1    (DF 167.)  Delivery to Distribution was not completed by November 5, 2005.  (DF

2    169.)  Distribution gave notice that it was not contractually delivered the Picture,

3    which Cinezeta's agent acknowledged.  (DF 171.)  Distribution has yet to receive all

4    of the elements of delivery set forth in Schedule A of the SAA.  (DF 175.)

5    **D.    Cinezeta Authorizes Service Providers To Receive Tax Credits And**

6    **Service Providers Use Tax Credits As Security For A Loan**

7         On March 17, 2005, Kayser (former director of Cinezeta) authorized JFP to be

8    Cinezeta's Official Designee for the purpose of applying for a Canadian Film

9    Production Services Tax Credit for the Picture.  (DF 178.)  In April 2006, JFP

10   applied to CIBC to borrow up to $3,630,773.00 against the Picture's tax credits.  (DF

11   180.)  CIBC agreed to the loan on April 28.  (DF 181.)  On May 11, 2006, CIBC

12   deposited CDN $3,380,773 into JFP's bank account.  (DF 182.)  The next day, JFP

13   transferred CDN $3,000,000 to IFE; and IFE transferred CDN $2,000,000 to Cavern.

14   (DF 183-184.)  "The $2 million was used to satisfy another debt that had to do with

15   another film that related to Cinerenta."  (DF 185.)

16        On September 19, 2006, Kayser authorized cancellation of the Escrow

17   Agreement for Cinegamma Internationale Filmproduktion mbH & Co. 1. Beteilgungs

18   ("Cinegamma"), the entity created for Alicia's Book, and demanded that the full

19   amount held therein be wired to a certain Account Number 112-646442 ("Acct

20   646442").  (DF 186.)  On September 25, 2006, Kayser confirmed that "the attorney

21   Mr. Lee Sacks is representing [Cinerenta] and [Cinegamma] in various disputes and

22   unresolved matters with Infinity and the Service Companies ..."  (DF 187.)  On

23   September 28, 2006, Vince authorized a wire transfer "to Lee Sacks" of US

24   $6,000,000 from Cavern's account # 7N5865 to Acct 646442.  (DF 188, 189.)

25        On July 12, 2007, Cinezeta and the Service Providers entered into a Settlement

26   Agreement and Mutual Release ("Settlement Agreement") relating to the Picture's

27   tax credits.  (DF 191.)  On August 8, 2007, Kayser signed an affidavit whereby he

28   authorized MF to be Cinezeta's Official Designee for applying for a British

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

-6-

1  Columbia Production Service Tax Credit for the Picture. (DF 194.) Cinezeta claims

2  that all of the Canadian tax credits were paid to the Service Providers but that these

3  entities "absconded the funds, kept them for themselves and now claim to be

4  insolvent." (DF 195.) Cinezeta claims that it still is trying to recover the tax credits,

5  and claims that it is possible that the tax credits still may come in. (DF 196.)

6  Distribution was not a party to, nor aware of, the foregoing transactions or actions

7  until the instant litigation. (DF 198.)

8  **E.**    **Cinezeta Has Received Over $4.2 Million From The Collection Account**

9       Distribution and Cinezeta designated Fintage House ("Fintage") to be the third

10  party collection agent to manage the Picture's collection account (the "Collection

11  Account"). (DF 199.) Fintage disbursed funds from the Collection Account only

12  after both Cinezeta and Distribution consented to the disbursement allocation. (DF

13  200.) On March 3, 2006, Cinezeta received $2,910,265.23 from the Collection

14  Account. (DF 201.) Around the same time, Distribution received $200,000 and First

15  Look received $200,000. (DF 202.) Pursuant to joint instructions from Distribution

16  and Cinezeta to Fintage, on March 13, 2008, Distribution received $393,344, and on

17  March 14, 2008, Cinezeta received $1,220,346, from the Collection Account. (DF

18  203.) On March 16, 2009, Distribution received $5,998.58 of additional sales

19  commission from the Collection Account. (DF 210.) Cinezeta did not object to the

20  payment. (DF 209.) In July 2010, Cinezeta received payment of $134,571.33 from

21  the Collection Account. (DF 212.)

22  **F.**    **International Was Formed To Start New Projects**

23       On July 5, 2006, Distribution entered into a Credit, Security, Guaranty and

24  Pledge Agreement with D.B. Zwirn ("Zwirn"), which provided up to $65 million of

25  debt financing for film productions (the "Credit Facility"). (DF 232.) Under the

26  Credit Facility, Distribution was able to produce approximately five films. (DF 233.)

27  In February 2008, Distribution became aware of rumors of a world-wide meltdown

28  in the credit markets indicating Zwirn would collapse, thereby freezing up all credit

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51462435

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1   and tying up all pledged collateral.  (DF 234.)  Soon thereafter, on or about March

2   28, 2008, Zwirn notified Distribution that Zwirn must cease all lending opportunities

3   under the Credit Facility.  (DF 235.)  Thereafter, Distribution could not acquire new

4   sales contracts or obtain financing for new projects.  (DF 236.)  At the time,

5   Distribution had films in various stages of post-production.  (DF 237.)  Rather than

6   file for bankruptcy, however, Distribution continued to operate and deliver its films.

7   (DF 238.)  Distribution has paid off its debt with respect to the Credit Facility.  (DF

8   239.)  International was formed in April 2008.  (DF 240.)  Seibel and Andrew Mann[2]

9   were the founding managers and members.  (DF 242.)  Thereafter, William Johnson

10  and James MacLean (who is no longer a manager or member) became managers and

11  members.  (DF 243-244.)  International was formed to start new projects; not to

12  avoid paying creditors or outstanding debts.  (DF 245-248.)  The decision to start

13  International had nothing to do with the Sales Guarantee or Cinezeta.  (DF 247.)

14  Distribution has never transferred any assets or rights in its sales contracts or any of

15  its assets or rights in the Picture to International.  (DF 251.)

16  **G.**     **Cinezeta Waits Until December 2010 To Give Written Notice**

17       On December 14, 2010, Cinezeta sent a letter to Distribution demanding

18  payment of the Sales Guarantee (or arrangement thereof) within three business days.

19  (DF 217.)  This was the first time Distribution received any written demand for

20  payment under the PGA.  (DF 218.)  On December 17, 2010, Distribution requested

21  documents supporting Cinezeta's demand.  (DF 219.)  Cinezeta did not respond.

22  (DF 222.)  On December 27, 2010, Cinezeta filed this lawsuit.  (DF 223.)

23

24

25

26  [2] Mann was CFO of Distribution and, in April 2008, he became a manager and
    member of International.  (DF 279.)  Cinezeta alleges that Mann began consulting for
27  Cinezeta in approximately 2009, and that Mann was, and still is, Cinezeta's agent.
    (DF 281.)  Mann stopped performing services for Defendants in late 2010.  (DF 282.)
28  Cinezeta now refuses to disclose emails with Mann and its attorneys on privilege
    grounds.  (DF 285.)

LA 51462435

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

# III.   ARGUMENT

## A.   Cinezeta Is Not Entitled To Judgment As A Matter Of Law

To recover damages for breach of contract, Cinezeta must prove: (1) Cinezeta and Defendants entered into a contract; (2) Cinezeta did all, or substantially all of the things that the contract required them to do; (3) all conditions required for Defendants' performance occurred; (4) Defendants failed to do something required by the contract; and (5) Cinezeta was harmed by that failure.  Smith v. Royal Mfg. Co., 185 Cal. App. 2d 315, 325, 8 Cal. Rptr. 417 (1960).Under California law, contract interpretation is a matter of law and solely a judicial function.  Parsons v. Bristol Development Co., 62 Cal.2d 861, 865; 44 Cal. Rptr. 767 (1965).  "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting . . ."  Cal. Civ. Code § 1636.  The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.  Id. at § 1638.  "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."  Id. at § 1647.  Guarantees are interpreted using the same rules as any contract.  Cal. Civ. Code § 2837.  A guarantor's obligation, however, "is strictly construed so as not to impose a burden not contained in or clearly inferable from the language of the contract."  Airlines Reporting Corp. v. United States Fid. & Guar. Co., 31 Cal. App. 4th 1458, 1464; 37 Cal. Rptr. 2d 563 (1995).  "It is settled that a [guarantor] is not liable for anything that extends beyond the letter of its contract."  Id.  Here, Cinezeta must prove that that there is no genuine dispute as to any material fact in support of its breach of contract claim.  Fed. R. Civ. Proc. 56.  As set forth below, Cinezeta has far from satisfied its burden, and, thus, its Motion must be denied.

### 1.   Cinezeta Failed To Perform Under The Agreements

Cinezeta has failed to establish a necessary element of its breach of contract claim – that it performed under the Agreements.[3]  Cinezeta incorrectly assumes that

---

[3] Cinezeta's argument that Defendants waived their right to assert defenses lacks any merit.  First, it is Cinezeta's burden to establish it performed under the Agreements.

LA 51462435

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1   since the Picture was released, Cinezeta must have satisfied its "Delivery"

2   obligations under the Agreements.  Delivery, however, is a specific requirement

3   under the Agreements that Cinezeta has yet to satisfy.  The PGA provides that

4   payment of the Sales Guarantee is "subject to the production and delivery of the

5   Picture to Sales Agent in accordance with the Relevant Agreements[;]" (DF 127) and

6   that Cinezeta "will engage the Service Providers to provide production services for

7   [Cinezeta] and to make Delivery to Sales Agent." (DF 275.)  The PGA defines

8   "Delivery" as "delivery of the Delivery Materials of the Picture to Sales Agent as

9   specified and defined in the Completion Guaranty." (DF 168.)  Under the SAA,

10  "'Delivery' shall mean delivery to the location specified by Sales Agent and

11  technical acceptance by Sales Agent of all items listed on Schedule "A". . . Delivery

12  must be completed by November 30, 2005 . . ." (DF168.)  Schedule A lists a number

13  of elements required for Delivery.  (DF 170.)  Based on the language of these

14  Agreements, it is clear that parties intended for Delivery to have a specific meaning.

15       Here, Cinezeta failed to make Delivery to Distribution, as set forth in the PGA

16  and the SAA. [4]  First, Distribution never received nor was a party to a Completion

17  Guaranty that specified and defined the manner of Delivery to Distribution.  (DF

18  167.)  In fact, the Delivery Notice attached to Dr. Lechner's Declaration in Support

19  Second, Defendants asserted various affirmative defenses in their Answer, including
20  waiver, unclean hands, failure to perform contractual obligations, failure of
    conditions precedent and performance excused or prevented.  (DF 296.)  Third,
21  Defendants always maintained that their discovery responses were subject to change
    due to what they learned through ongoing discovery.  (DF 297.)  Fourth, Defendants
22  have not withheld any documents that support their defenses.  (DF 298.)  Fifth,
    Defendants only learned of many of the facts supporting Defendants' defenses
23  through discovery. (DF 299.)  For instance, Defendants learned about Cinezeta's
    2007 Settlement Agreement, Cinezeta's authorization of the tax credits to the Service
24  Providers, the CIBC loan, and various transfers of funds between the Service
    Providers and Cinezeta-affiliated companies for the first time in this litigation.  (DF
25  299.)  In fact, documents supporting these facts were in Cinezeta's possession and
    produced on August 24, 2011 (in response to discovery requests served in April 2011
26  and also the subject of Defendants' Motion to Compel) and Defendants are still
    waiting for the entirety of the document production from Cinezeta.  (DF 300.)
27  Finally, Cinezeta has not shown how it has been prejudiced by Defendants'
    purported delayed assertion of these defenses.
28  [4] The PGA provides that "[i]n the event of any inconsistency or omission as between
    this Agreement and the Sales Agency Agreements, the terms and conditions of the
    Sales Agency Agreements shall govern and control . . ." (DF 274)

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1   of Cinezeta's Motion (whether or not admissible), which shows that Distribution was

2   not a party to the notice, only supports the fact that Distribution was not made party

3   to such a Completion Guaranty.[5]   (See CF 18.)  Thus, "Delivery" pursuant to the

4   PGA could not be effected.  "Delivery" pursuant to the SAA was not effected either.

5   Contrary to Cinezeta's unsupported allegations (see CF 27), Distribution did in fact

6   notify Cinezeta of its problems with Delivery.  By January 17, 2006, Delivery to

7   Distribution still had not been effected.  As such, Distribution notified Bill Vince

8   (whom, as principal of the Service Providers, Cinezeta hired to make Delivery to

9   Distribution) that Distribution had not been contractually delivered the film, thereby

10  precluding Distribution from placing orders to fulfill buyer demands.  (DF 171.)  Mr.

11  Vince even acknowledged that the film was not delivered by this time.  (DF 172.)

12  And again, in July 2006, Distribution notified Mr. Vince of its problems with

13  delivery.   (DF 174.)  Distribution still has not received Delivery as set forth in

14  Schedule A.  (DF 175.)  For instance, Distribution has not been delivered a complete

15  set of all the signed vendor agreements, music publishing licenses, audio stems,

16  clearance agreement, hot cost reports, production ledgers, production notes, complete

17  set of 35mm production stills (slides), lab access agreements (giving Distribution

18  access for the duration of SAA), hard drives of music masters, and other elements set

19  forth in Schedule A.  (DF 177.)  While Distribution still was able to sell the Picture

20  to sub-distributors, the lack of contractual delivery hindered its ability to do so (as

21  reflected in its correspondence) and likely will continue to hinder its ability to sell

22  the Picture during the second cycle of sales.[6]  (DF 176.)  Because sub-distributors

23  often require that Distribution have all of the elements set forth in Schedule A prior

24  to signing a license agreement, particularly more so now than ever since many of the

25  [5] Lechner's testimony regarding delivery is not admissible as he himself admits that
    he was not at Cinezeta at the time the Picture was produced and, thus, has no
26  personal knowledge with respect to whether or not Delivery was satisfied.   (CF 18.)
    The only other "evidence" to which Cinezeta cites is the testimony of Michael
27  Ohoven, who never testified that "Delivery" pursuant to the Agreements was
    satisfied and who only suspected that Distribution accepted delivery. (CF 18.)
28  [6] Second cycle is when the term of a film's first sublicense agreement expires and
    will be relicensed to sub-distributors for additional revenue under new terms.

LA 51462435

1   new distribution platforms require more than the basic elements, Distribution

2   anticipates that many sub-distributors will not license the Picture absent receipt of all

3   of the elements in Schedule A.  (DF 301.)  Since this directly affects the Picture's

4   gross receipts, it also affects the Sales Guarantee.  Moreover, absent Delivery, the

5   Sales Guarantee provision is not even triggered as the Sales Guarantee is "subject to"

6   delivery of the Picture to Distribution.  (DF 127.)

2.      **Distribution Has Satisfied Its Obligations Under The Agreements**

a.      **Payments To Cinezeta Reduce The Sales Guarantee**

9   Contrary to Cinezeta's allegation, Distribution has not "failed and refused to

10  pay the Sales Guarantee, or any portion thereof."  (Complaint, ¶ 29.)  Further,

11  contrary to Cinezeta's allegation, the Sales Guarantee is not unconditional,

12  irrevocable, and without offset.  As discussed above, the Sales Guarantee is subject

13  to production and delivery of the Picture to Sales Agent.  Moreover, as Cinezeta

14  acknowledges the Sales Guarantee:

> . . . shall be <u>subject to reduction</u> in accordance with the Approved
> Recoupment Schedule and <u>subject to reduction</u> for any amounts of the
> Sales Guarantee that are paid directly to [Cinezeta] rather than the
> Collection Account which amounts [Cinezeta] will advise the Collection
> Agent have been paid directly to [Cinezeta] and, as a result, should
> <u>reduce the amount</u> of the Sales Guarantee accordingly. . .

18  (DF 128.) (emphases added.)  Accordingly, as Cinezeta acknowledges, Cinezeta's

19  receipt of $4,266,182.56 reduces the Sales Guarantee.  (<u>See</u> CF 49.)  Thus, before

20  factoring in the tax credits, these payments to Cinezeta reduced the Sales Guarantee

21  to, at the very most, $3,427,917.44.

b.      **The Tax Credits Rights Reduce The Sales Guarantee**

23  Furthermore, the Sales Guarantee has been reduced further by Cinezeta's

24  irrevocable right to $3.6 million in tax credits that were made payable to Cinezeta

25  rather than the Collection Account, pursuant to Cinezeta's demand.  Cinezeta fails to

26  acknowledge that the Guarantee provision of the PGA requires that "[Cinezeta] is the

27  <u>sole beneficiary of the tax credits and that the tax credits shall be payable directly to</u>

28  <u>[Cinezeta]</u> rather than the Collection Account."  (DF 128 (emphasis added).)  It also

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51462435

provides that "any amounts of the Sales Guarantee that are paid directly to [Cinezeta] rather than the Collection Account. . . reduce the amount of the Sales Guarantee accordingly." (DF 128.) Thus, Cinezeta's irrevocable right to the tax credits operated to reduce the Sales Guarantee. The plain and clear language of the Assignment that Cinezeta acknowledges it entered supports this interpretation, as the Assignment provides: (1) "[Service Providers] desire to assign their right to receive US$3,600,000 in tax credits (the "Tax Credits") to Cinezeta[;]" (2) "[Service Providers] irrevocably and unconditionally assign to Cinezeta the Tax Credits[;]" and (3) "Cinezeta acknowledges and agrees that its receipt of the Tax Credits shall be used to reduce the Tax Credit Guarantee as defined in the [PGA]." (DF 159 (emphasis added).) The Assignment attached estimate letters from SaskFilm (the Saskatchewan film commission and funding agency) and a chartered accounting firm confirming the amount of available Tax Credits. (DF 159.) Thus, the "right to" the tax credits reduced the Sales Guarantee.

Notably, the definition of the Sales Guarantee supports Distribution's argument that Cinezeta's irrevocable rights to the tax credits (whether or not they were cashed by Cinezeta) reduced the Sales Guarantee. Three items are listed as part of the Sales Guarantee. Item (i) is described as "US$1,811,00 **from** the Presale Agreements," and item (ii) is described as "US$2,850,000 **from** BOI Letter of Credit." (DF 127 (emphasis added).) Unlike items (i) and (ii), however, item (iii) is described as "US3,600,000 in the **form of** an irrevocable assignment…confirming the amount of the tax credits. . . ." (DF 127 (emphasis added).) Because item (iii) specifically states that the $3,600,000 will be in the "form of" an irrevocable assignment as opposed to $3,600,000 "from an" irrevocable assignment, and because it is undisputed that Cinezeta received this irrevocable assignment, there is no "shortfall" of item (iii) of the Sales Guarantee. If Cinezeta had expected a guarantee for any shortfall in the amount of money it received from the tax credits assignment, surely it would have drafted item (iii) in the same manner as it drafted items (i) and

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067–3086

LA 51462435

1   (ii). Accordingly, based on the clear language of these agreements, and as Cinezeta

2   explicitly acknowledged in the Assignment, Cinezeta's irrevocable "right to receive

3   US$3,600,00 in tax credits" reduced the Sales Guarantee.

4          Further, Distribution's interpretation of the PGA should be applied as it

5   reflects the mutual intent of the parties as it existed at the time of contracting. <u>See</u>

6   Cal. Civ. Code § 1636. Cinezeta clearly did not expect Distribution to be liable for

7   the entirety of the $7,694,100, as made evident in a September 28, 2004 email sent

8   by Marco Mehlitz, a former director of Cinezeta, to various parties involved in the

9   Picture, including Distribution and other Cinezeta executives:

10          Cinerenta Investors are well informed about the few deals Inferno had been
11          able to secure in the past two years while selling the Cinerenta Library,
            generating almost no profits for Inferno. As the legal opinion on the tax credit
12          is a bankable document itself, this will certainly be fine.

13   (DF 150.) Distribution always understood that its liability under the Sales Guarantee

14   was never more than $7,694,100 minus $3,600,000 if the assignment of tax credits

15   was made and the tax credits issued.  (DF 151.)  It would make no sense for

16   Distribution, who had no control over the Service Providers and who was not a party

17   to the PSA or Assignment, to promise to pay the monetary equivalent of the tax

18   credits in the event that the tax credits were made payable to the Service Providers

19   (who were selected, hired and controlled by Cinezeta) and not payable to Cinezeta

20   directly.  Applying Cinezeta's interpretation would result in an absurdity.  Cinezeta's

21   interpretation would essentially mean that Cinezeta could receive the right to the tax

22   credits, but then choose to not cash it, choose to give it to someone else, or choose to

23   lose it, then seek the monetary equivalent from Distribution by arguing that it never

24   actually received the "cash" from the tax credits.  Such a result is not permitted under

25   the law. <u>See</u> Cal. Civ. Code § 1638 ("The language of a contract is to govern its

26   interpretation, if the language is clear and explicit, and does not involve an

27   absurdity).  Accordingly, Cinezeta's irrevocable right to the tax credits reduced

28   Distribution's liability under the Sales Guarantee.

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067–3086

-14-

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

c.     **Cinezeta Willingly Gave Up The Rights To The Tax Credits Money And Agreed To Pay For Its Own Liabilities**

Moreover, even if the Service Providers did in fact steal the money from the tax credits, Cinezeta, not Distribution, would be liable for any resulting loss.  The PGA explicitly provides that Cinezeta "shall at all time pay for its liabilities with its own funds which have been obtained from its operations." (DF 137.)  As discussed above, Cinezeta agreed that it would be "the sole beneficiary of the tax credits and that the tax credits shall be payable directly to" Cinezeta.  (DF 128.)  Yet, without informing Distribution, Cinezeta thereafter gave the Service Providers the right to receive the tax credits.  (DF 178, 194.)  In doing so, Cinezeta materially breached the Guaranty provision of the PGA.  Cinezeta also created a greater risk of not receiving the money from the tax credits – a risk that Distribution never assumed nor intended to assume.  (DF 302.)  Furthermore, Cinezeta gave up the rights to the tax credits willingly when, in 2007, it (without Distribution's involvement or consent) settled a dispute with the Service Providers for the "monetary equivalent of the Tax Credits received or credited to JFP or MF, less $540,000." (DF 192(emphasis added).)  Thus, Distribution cannot be liable for Cinezeta's alleged failure to collect the tax credit money when it intentionally gave up the rights to them.

Moreover, pursuant to the PSA, Cinezeta agreed, among other things, (1) to hire the Service Providers "on a work-for-hire basis on behalf and for the account of and under the direction and control of [Cinezeta;]" (2) that all agreements the [Service Providers] entered into "shall always be for the account and benefit of the [Cinezeta;]" and (3) that Cinezeta "intends continually, to supervise, or cause others to supervise, all production contracts and processes[.]" (DF 154-156.)  Given that, under the PGA, Cinezeta represented, warranted and covenanted that Cinezeta would "comply or procure compliance with the terms" of the PSA and "obtain all approvals needed thereunder and do all such acts as may be necessary to enforce the terms

1  thereof" (DF 139), Cinezeta is liable for any breach of the PSA by the Service

2  Providers and for any failure by Cinezeta to oversee and control them.

### d.    Cinezeta Secretly Benefitted From The Tax Credits

4  The PGA explicitly provides that "except for the Relevant Agreements and

5  any related agreements, [Cinezeta] has not entered into any agreement or granted any

6  license, security interest or other interest affecting the Picture." (DF 140.)  Similarly,

7  in the SAA, Cinezeta represents, for the Term of the SAA, that "there are no liens or

8  encumbrances against the Picture that would materially adversely affect Sales

9  Agent's rights hereunder." (DF 141.)  Based on the documents produced by

10  Cinezeta on August 24, 2011, it is clear that the Service Providers obtained a loan

11  from CIBC in exchange for granting CIBC a security interest in the tax credits,

12  among other things. (DF 180-182.)  Such a grant of security would excuse any

13  requirement that Distribution pay the allegedly stolen money from the tax credits

14  since the security interest would adversely affect Cinezeta's ability to directly collect

15  the money from the tax credits, and thereby (based on Cinezeta's argument) affect

16  Distribution's rights under the PGA.  Even if Cinezeta did not authorize the Service

17  Providers to take the loan, the PSA clearly provides that any contracts the Service

18  Providers enter are for the benefit of Cinezeta, and Cinezeta represented that it would

19  procure compliance with the terms of the PSA. (DF 139, 156.)  Thus, Distribution

20  has no obligation to pay for any alleged losses arising from a liability that Cinezeta

21  ensured would not occur.  Moreover, the CIBC loan directly benefitted Cinerenta,

22  Cinezeta's former general partner. (CF 2, 3.)  In the PGA, Cinezeta represented that

23  the Picture's Production Account will be "opened solely for the purposes of the

24  production of the Picture" and promised that "[i]t shall not commingle its funds and

25  its other assets with those of any other entity or person…". (DF 142.)  In violation of

26  the PGA, Cinezeta's director, Kayser, authorized JFP to use at least $2 million from

27  the CIBC loan (borrowed against the Picture's tax credits) to satisfy another debt

28  incurred on another film funded by a Cinerenta affiliated entity. (DF 180-189.)

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

-16-

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1    Cinezeta's own self-described agent testified to this.  (Id.)  Thus, Cinezeta cannot

2    demand the monetary equivalent of the tax credits where, not only did it give up the

3    rights to the tax credits via the Settlement, but where its own director authorized that

4    the money be used to pay down a completely separate debt of another Cinerenta

5    affiliated production, thereby giving Cinerenta the benefit of the tax credits money.

6    **3.**     **Cinezeta's Claim Is Premature**

7         Cinezeta alleges that "[p]ursuant to the PGA, [Distribution] was obligated to

8    pay to Cinezeta a Sales Guarantee in the amount of $7,694,100 no later than the

9    Payment Date … The Payment Date was January 10, 2008."  (Complaint, 29.)  The

10   PGA, however, contains no representations, warranties, or covenants that

11   Distribution will pay the Sales Guarantee by the Payment Date.  (DF 135.)

12   Moreover, nothing in the PGA suggests that failure to satisfy the Sales Guarantee by

13   January 10, 2008 constitutes a breach of the PGA.  In fact, failure to satisfy the Sales

14   Guarantee by January 10, 2008 is not listed as an Event of Default.  (DF 130.)

15        While Distribution is not required to satisfy the Sales Guarantee by January

16   10, 2008, its failure to do so is not without recourse.  The PGA provides: "in the

17   event the Sales Guarantee is not paid by the Payment Date[,]" Cinezeta "may, at its

18   election, terminate the Sales Agency Agreements by notice."  (DF 133.)  In the event

19   of termination, "[Cinezeta] shall be entitled to (i) the benefits of all agreements

20   entered into by Sales Agent for exploitation of the Picture and (ii) possession of all

21   documents relating thereto."  (DF 134.)  Thus, if Cinezeta is not satisfied with

22   Distribution's progress in meeting the Sales Guarantee, Cinezeta has the option to

23   terminate the SAA and either take control of selling the Picture or let someone else

24   take control.  Notably, the PGA never says that, in the event that the Sales Guarantee

25   is not paid by the Payment Date, Cinezeta has the option to collect immediately the

26   entirety of the Sales Guarantee.  (DF 135.)  As such, even if Distribution did not

27   satisfy the Sales Guarantee (it did), Cinezeta would be precluded from demanding

28   the Sales Guarantee.  Cal. Civ. Code § 1656 ("All things that in law or usage are

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1 | considered as incidental to a contract, or as necessary to carry it into effect, are

2 | implied therefrom, unless some of them are expressly mentioned therein, when all

3 | other things of the same class are deemed to be excluded"). Thus, Cinezeta's only

4 | remedy for failure by Distribution to pay the Sales Guarantee by the Payment Date is

5 | termination of the SAA. Imposing the requirement that the Sales Guarantee be due

6 | by January 10, 2008 where the PGA does not state so would improperly impose a

7 | burden on Distribution "not contained in or clearly inferable from the language of the

8 | contract." Airlines, supra, 31 Cal. App. 4th at 1464; 37 Cal. Rptr. 2d at 567.

9 |     Moreover, Cinezeta's interpretation of the PGA is illogical. If, as Cinezeta

10 | claims, Distribution has not satisfied the entirety of the Sales Guarantee, then

11 | Distribution's obligation under the PGA would not yet be ascertainable since,

12 | according to Cinezeta, "if money comes in, then it reduces the guaranty." (DF 136.)

13 | Thus, it would not make sense to permit Cinezeta to demand payment now because,

14 | notwithstanding Distribution's satisfaction of the Sales Guarantee, the Sales

15 | Guarantee can change depending on whether additional monies come in from the

16 | Picture (either though the allegedly stolen tax credits or through the rest of the 25

17 | year term of the SAA). If Cinezeta was correct, it would be entitled to a double

18 | payment: it could demand money from Distribution and also recoup any money that

19 | still comes in from the Picture (on top of receiving the benefit of the Assignment).

20 | There is nothing in the PGA that permits such an absurd result. Furthermore, if

21 | Cinezeta was entitled to demand payment by January 10, 2008, Cinezeta surely

22 | would not have authorized Fintage to pay Distribution a sales commission of

23 | $393,344 in March 2008, two months after the Payment Date, and again in 2009.

24 | (DF 203, 210.) And even if it did constitute a breach, Cinezeta's authorization of the

25 | post-Payment Date commission would constitute a waiver of its right to claim that

26 | the Sales Guarantee was due by said date. Leiter v. Eltinge, 246 Cal. App. 2d 306,

27 | 317-18; 54 Cal. Rptr. 703 (1966) (where plaintiff elected to treat the contract as still

28 |

LA 51462435

alive and viable and accepted further performance from defendant, "the rule is well-established he waived the right to hold [defendant] for damages for the breach").

### 4.   Any Ambiguity Should Be Construed Against Cinezeta

While it is clear that Cinezeta's right to the tax credits reduced the Sales Guarantee, to the extent the Court finds an ambiguity, the PGA should be construed against Cinezeta, a sophisticated party whose lawyers were involved in the drafting of the Agreements.  Distribution did not draft the Agreements and was not represented by counsel during the negotiations or drafting process.  (DF 145.)  On the other hand, lawyers for Cinezeta and Infinity were involved in the negotiation and drafting of the Agreements.  (DF 143.)  Notably, Cinezeta appointed "any and all personnel of Infinity to be its consultant to liaise with Sales Agent in respect of the distribution and sales of the Picture."  (DF 276.)  Cinezeta also designated Infinity's lawyers (along with Kayser) to receive on its behalf notices under the PGA.  ( 277.)  Thus, it is apparent that Cinezeta controlled the drafting of the Agreements.  Moreover, Cinerenta (the company that managed Cinezeta) was a sophisticated German entity that previously had been party to many guarantee agreements involving films it produced or financed through other special purpose entities.  (DF 118.)  Distribution, on the other hand, had not entered into any guarantee agreements with Cinezeta or Cinerenta prior to the Agreements and, during the negotiation process, Distribution was represented by Seibel, a non-lawyer who did not graduate from college. (DF 146-147.)  Distribution was only two years old at the time, and Seibel had previously handled only the sales of films already in the Cinerenta library, not new films.  (DF 147.)  Furthermore, in the event the Court finds ambiguity or uncertainty in the Agreements, they must be interpreted in the sense in which Distribution believed, at the time of agreeing to the Sales Guarantee, that Cinezeta understood it.   Cal. Civ. Code § 1649 (If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.)  Thus, given that

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067–3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067–3086

1    Distribution never believed that Cinezeta would expect Distribution to pay the

2    monetary equivalent of the tax credits in the event that Cinezeta received an

3    irrevocable assignment for the tax credits that were in fact paid by the Canadian

4    government but were thereafter "absconded" by the Service Providers whom

5    Cinezeta selected, hired, and controlled, the Court should interpret the Sales

6    Guarantee as Distribution submits.

7         **5.    Cinezeta's Interest Argument Fails**

8         Cinezeta claims that it is entitled to $3,427,917.44 plus interest accruing from

9    January 10, 2008.  Cinezeta is not entitled to anything.  Yet, even if Distribution

10   owed Cinezeta money, Cinezeta would not be entitled to interest from that date, as it

11   failed to give proper notice of any default and demand payment pursuant to the PGA.

12   The PGA requires that "[a]ny notice or demand to be given under these Agreements

13   shall be in writing."  (DF 278.)  It also requires that Cinezeta give written notice to

14   Sales Agent of any material breach and give it 21 days of the receipt of such "written

15   notice from [Cinezeta] specifying the breach and the steps reasonably required to

16   remedy the same[.]" (DF 129.)  It is undisputed that Cinezeta failed to give written

17   notice of any purported default prior to December 14, 2010.  (DF 221.)  Even then,

18   and notwithstanding the fact that Distribution was not in default, Cinezeta failed to

19   give Distribution 21 days to cure.  (DF 222-223.)  On December 17, Distribution

20   responded to Cinezeta's December 14 letter and requested documents to support its

21   demand for $7,694,100 (DF 220 ); rather than respond to Distribution's request,

22   Cinezeta chose to file the instant action on December 27.  (DF 223.)  Thus, Cinezeta

23   would not be entitled to interest accruing prior to January 4, 2011 (21 days after its

24   first written demand) if even that.  See Walsh v. W. Valley Mission Community

25   College District, 66 Cal. App. 4th 1532, 1546-47 (1998) (finding that an element of a

26   claim against a guarantor for breach of a guarantee is that the creditor "notified the

27   guarantor of the default and demanded payment").  Moreover, Cinezeta would not be

28   entitled to interest because, even if Distribution owed it money under the Guarantee

-20-

LA 51462435

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1    provision (it does not), Cinezeta's claim for damages is not certain or capable of

2    being made certain by calculation.  See Cal. Code Civ. Proc. § 3287 (a).  As Cinezeta

3    itself has admitted "if money comes in, then it reduces the guaranty."  (DF 136.)

4    Moreover, the amount of the Sales Guarantee outstanding is disputed – Cinezeta

5    originally claimed that Distribution owed it $7,694,100 and now claims that

6    Distribution owes it $3,427,917.44.   Distribution, however, contends that the Sales

7    Guarantee has been reduced to $0.  Because the parties dispute the amount of the

8    Sales Guarantee and because, based on Cinezeta's own contention, the Sales

9    Guarantee number is not a fixed amount, any damages due would be uncertain, thus

10   precluding an award of interest.   Cal. Code Civ. Proc. § 3287 (a), (b); Elliano v.

11   Assurance Co. of America, 45 Cal. App. 3d 170, 183-183 (1975) (holding that

12   prevailing party should be denied prejudgment interest under Sections 3287(a) and

13   (b) where the parties had disagreed about "the basis of computation of damages").

**B.      Cinezeta Cannot Establish A Claim Of Alter Ego**

15          Cinezeta is not entitled to judgment as a matter of law with respect to its

16   breach of contract claim against International because it was not a party to the

17   Agreements.  International cannot be liable under an alter ego theory either because

18   Distribution is not liable and because International is not its alter ego.

**1.      International Is Not The Alter Ego Of Distribution**

20          "Alter ego is an extreme remedy, sparingly used."  Sonora Diamond Corp. v.

21   Superior Court, 83 Cal. App. 4th 523, 539, 99 Cal. Rptr. 2d 824, 836 (2000); Playboy

22   Enters., Inc. v. Welles, 279 F.3d 796, 807 (9th Cir. 2002) ("We note that the alter ego

23   rule is generally applied with caution.").  It is "invoked only where recognition of the

24   corporate form would work an injustice to a third person."  Webber v. Inland Empire

25   Invs., 74 Cal. App. 4th 884, 900; 88 Cal. Rptr. 2d 594 (1999).  Thus, the corporate

26   form will be disregarded only in narrowly defined circumstances and only when the

27   ends of justice so require.  Wady v. Provident Life & Accident Ins. Co., 216 F. Supp.

28   2d 1006 (C.D. Cal. 2002) (applying California law).  For the doctrine to be invoked,

-21-

1   two elements must be met: (1) "there is such unity of interest and ownership between
2   the corporation and the individual or organization controlling it that the separate
3   personalities of the corporation no longer exist, and (2) that failure to disregard the
4   corporation would sanction a fraud or promote injustice." Id.; see also Flynt
5   Distributing Co., Inc. v. Harvey, 734 F. 2d 1389 (9th Cir. 1984).  The plaintiff bears
6   the burden in presenting evidence that satisfies both prongs of the test.  Mid-Century
7   Ins. Co. v. Gardener, 9 Cal. App. 4th 1205, 1212; 11 Cal. Rptr. 2d 918 (1992).

8   ### a.  International Is A Distinct Corporate Entity

9       International is not a continuation of Distribution, but a new company with
10  different assets, personnel and purposes.  While Distribution's main revenue source
11  is from its sales contracts, International, unlike Distribution, also generates revenue
12  from music publishing and developing and producing films.  (DF 252-253.)  Further,
13  International and Distribution each maintain their own books and records.  (DF 254-
14  260.)  International and Distribution maintain separate QuickBooks records, have
15  separate bank accounts at separate banks, have distinct articles of incorporation and
16  operating agreements, file separate tax returns, and have different company credit
17  cards.  (DF 254-263.)  Moreover, the revenue that Distribution receives from the
18  sales contracts it has in its own films (such as the Picture) go directly to
19  Distribution's bank account.  (DF 260.)  These funds are used to continue
20  Distribution's operations.  (DF 269.)  Distribution never has assigned, gifted, sold or
21  transferred any of its rights in the Picture (or in any of its titles) to International.  (DF
22  251.)  Similarly, the revenue that International receives from its sales contracts (for
23  its own distinct titles) go directly to International's bank account.  (DF 258.)  In fact,
24  each of their respective titles has its own designated collection account with a third
25  party collection agent.  (DF 259.)  Thus, money disbursed from the collection
26  account for a Distribution title, such as the Picture, is automatically directed to
27  Distribution's account.  (DF 260.)  While Distribution has made loans to
28  International and vice-versa, those loans must be paid back by a certain date with

-22-

interest.  (DF 262.)  Thus, Distribution does not transfer any significant amounts of money to International without receiving consideration.  (DF 261.)   In addition, while the two entities have common owners, Seibel and Johnson, International has had other shareholders that were not shareholders of Distribution – MacLean and Mann.  (DF 226, 242, 243.)  Contrary to Cinezeta's allegations, Mann was not merely a figurehead, but was involved in the management of Distribution's finances, payroll, and financial records.  (DF 280)  Many of International's employees are not employees of Distribution.  (DF 264.)  Finally, both companies are adequately capitalized.  (DF 266.)  Each continue to maintain assets in films from which each derive revenue to operate and enter into contracts.  (DF 269.)  Cinezeta itself has testified that these entities have enough to pay the Sales Guarantee.  (DF 270.)

**b.**   **Failure To Pierce The Corporate Veil Would Not Sanction a Fraud Or Promote Injustice**

Even if Cinezeta could prove that Distribution owed it money and that International was not a distinct corporate entity (it cannot), summary judgment in favor of Cinezeta is improper because Cinezeta has failed to set forth any facts to satisfy the second condition of its alter ego claim – that failure to pierce the corporate veil would sanction a fraud or promote injustice.  Playboy Enters., 279 F.3d at 807 (finding that summary judgment on breach of contract claim based on an alter ego was proper even where plaintiff established a unity of interest because it failed to establish the second prong).  There is no truth to Cinezeta's contention that International was created for a fraudulent purpose.  Both Johnson and Seibel tesitifed that International was formed because Distribution could not obtain financing for new projects due to well-known internal problems at Zwirn – not because they did not want new films to become collateral for the Zwirn Credit Facility.  (DF 246.)  In fact, they testified that it was impossible to make new films at Distribution because of the Zwirn meltdown. (DF 246.)  Also, International's formation had nothing to do with any problems at Distribution or any purported debt it owed to Cinezeta, or any

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

-23-

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1    other entity or person for that matter.  (DF 247.)  In fact, it is impossible that

2    International was formed for the purpose of avoiding Distribution's purported debt to

3    Cinezeta, since Distribution had no reason to believe that Cinezeta would demand

4    any payment from Distribution prior to December 2010.   Distribution's belief was

5    reasonable given that after January 10, 2008, Cinezeta authorized payment of sales

6    commissions to Distribution, Lechner visited Distribution's offices without ever

7    demanding payment under the PGA, Lechner made subsequent business propositions

8    to Distribution, and Lechner never wrote any letters demanding payment under the

9    PGA as he did on numerous occasions with another former Cinerenta film, entitled

10   Ripley.  (DF 209, 286, 288.)  Even Lechner testified that Seibel made it clear that

11   Distribution did not think it owed Cinezeta anything.  (DF 287.)  Based on the

12   foregoing, Lechner's allegation that, in May 2008, Seibel threatened to transfer funds

13   and create a new company to avoid debts clearly is preposterous.  If Seibel really did

14   state the foregoing, surely Lechner would have informed someone of it, would have

15   documented it in some manner, would not have visited Distribution's offices again,

16   and would have filed suit earlier.  Moreover, the mere fact that Defendants share

17   resources is a function of cost savings and not fraud.  (DF 303.)

18        Furthermore, Cinezeta has failed to point to any evidence supporting its bald

19   conclusion that failure to pierce the corporate veil would promote an injustice.  This

20   is because Distribution is still a viable company with its own assets.  As mentioned,

21   payments due to Distribution from sublicensees were never transferred to

22   International, and Distribution directly receives all of the revenue derived from its

23   own titles, including the Picture.  (DF 258, 271.)  As Distribution continues to

24   maintain its rights in its films, Distribution soon will be entering its second cycle

25   sales contracts for its titles, from which it will be able to generate revenue.  (DF 272.)

26   Notably, Cinezeta acknowledges that both Distribution and International have

27   sufficient funds to pay the Sales Guarantee.  (DF 267.)  Even if, however,

28   Distribution had to pay Cinezeta but was unable to do so (Cinezeta does not make

1  this claim), that alone would not constitute an inequitable result that would justifying

2  piercing the corporate veil.  Bowoto v. Chevron Texaco Corp., 312 F. Supp. 2d 1229,

3  1247 (N.D. Cal. 2004).  Rather, forcing International, who was not a party to the

4  Agreements, to continue to litigate this action would result in injustice.[7]

## IV.  CONCLUSION

6      For the foregoing reasons, Defendants request that this Court deny Plaintiff's

7  Motion, as Cinezeta cannot establish that there is no dispute of material fact.

Dated:  September 26, 2011          STROOCK & STROOCK & LAVAN LLP

                                    By    s/ Gloria Y. Chang
                                    _____
                                    Attorneys for Defendants
                                    INFERNO DISTRIBUTION, LLC and
                                    INFERNO INTERNATIONAL, LLC

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

---

[7] The cases to which Cinezeta cites do not support a finding of alter ego here.  For instance, Cinezeta neglects to mention that the appellate court in Baize v. Eastridge, 142 Cal. App. 4th 293, 299 (2006) upheld the trial court's alter ego on the grounds that appellants did not raise a substantial evidence challenge and that they manufactured an argument that the trial court based its ruling solely on the common ownership factor, which was not supported by the record.  Moreover, in that case, appellants admitted to funneling money between the companies, and documents made it evident that the company plaintiff that wanted to pierce was the one behind the wrongdoing.  Similarly in McLaughlin v. L. Bloom Sons Co., Inc., 206 Cal. App. 2d 848, 851-852 (1962), Defendants did not challenge the sufficiency of a myriad of factors indicating unity of interest, including that customer ledger sheets reflected purchases by customers from both corporations.  More importantly, the trial court found alter ego liability only after recognizing that a failure to recognize it would permit Company A to use Company B as an instrumentality to avoid recognition of a union as the bargaining agency for Company B employees and thus avoid complying with all of the other provisions of the collective bargaining agreement inuring to the benefit of those employees; had Company A operated Company B directly, it would have been bound by such provisions. Id. at 853.  Thus, the avoidance of these contractual obligations would be unfair and unjust to the union, its members, Company B employees and the public. Id.  Moreover, contrary to Cinezeta's implications, in Dong AH Tire & Rubber Co., Ltd v. Glasforms, Inc., 2009 WL 975817 *10 (N.D. Cal. Apr. 10, 2009), the court never held that failure to maintain separate websites and characterizations of two entities on a single website was a significant factor in supporting an alter ego claim but merely found that that plaintiff created an issue of material fact to withstand summary judgment.

-25-