|  |  |
|---|---|
| UNITED STATES DISTRICT COURT<br>CENTRAL DISTRICT OF CALIFORNIA | **PRIORITY SEND** |

### CIVIL MINUTES -- GENERAL

Case No.   **CV 10-9938-JFW (FMOx)**                                                   Date:  October 24, 2011

Title:   Cinezeta Internationale Filmproduktionsgesellschaft mbH and Co 1. Beteiligungs KG
         -*v*- Inferno Distribution, LLC, et al.

**PRESENT:**

   **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

   Shannon Reilly                                              None Present
   Courtroom Deputy                                            Court Reporter

**ATTORNEYS PRESENT FOR PLAINTIFFS:**        **ATTORNEYS PRESENT FOR DEFENDANTS:**
              None                                              None

**PROCEEDINGS (IN CHAMBERS):**   ORDER GRANTING IN PART, DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO ITS FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
[filed 9/19/2011; Docket No. 48];

ORDER DENYING DEFENDANTS INFERNO DISTRIBUTION, LLC AND INFERNO INTERNATIONAL, LLC'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT
[filed 9/19/2011; Docket No. 64]

   On September 19, 2011, Plaintiff Cinezeta Internationale Filmproduktionsgesellleschaft mbH & Co. 1 Beteiligungs KG ("Plaintiff" or "Cinezeta") filed a Motion for Partial Summary Judgment as to its First Claim for Relief Against All Defendants.  On September 26, 2011, Defendants Inferno Distribution, LLC ("Distribution") and Inferno International, LLC ("International") (collectively "Defendants") filed their Opposition.  On October 3, 2011, Plaintiff filed a Reply.

   On September 19, 2011, Defendants filed a Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment.  On September 26, 2011, Plaintiff filed its Opposition.  On October 3, 2011, Defendants filed a Reply.

   Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found these matters appropriate for submission on the papers without oral argument.  The matters were, therefore, removed from the Court's October 17, 2011 hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers, and the

arguments therein, the Court rules as follows:

I.   **FACTUAL AND PROCEDURAL BACKGROUND**[1]

This dispute arises out of the funding of the production and distribution of a motion picture entitled "*Just Friends*" (the "Picture"). Cinezeta claims that Defendants owe it $3,427,917.44, plus interest, pursuant to a contract between the parties.

A.   **The Agreements**

In 2004, Cinezeta and Distribution entered into two written agreements providing for the production and distribution of the Picture. The Agreements consisted of a Production Guarantee Agreement effective December 1, 2004, and a Sales Agency Agreement effective August 30, 2004 (collectively, the "Agreements"). Separately, Cinezeta entered into a Production Services Agreement with Just Friends Productions, Inc. and Mooseface Productions, Inc. (collectively, the "Service Providers"), who were retained to provide production services for the Picture and, upon completion of the Picture, to deliver the Picture to Distribution.

Under the Agreements, Cinezeta is identified as the Producer of the Picture and agreed to provide $9,000,000 in equity funding plus $9,000,000 in the form of a revolving production loan. Distribution was designated as the exclusive Sales Agent for the Picture in all territories other than the United States and Canada (and certain other related territories), and "unconditionally and irrevocably agreed to pay Cinezeta a "Sales Guarantee" in the amount of $7,694,100, no later than the Payment Date, which is specified in the contract as January 10, 2008. Specifically, the "Sales Guarantee" is defined in the Production Guarantee Agreement as follows:

> [S]ubject to the production and delivery of the Picture to [Distribution] in accordance with the Relevant Agreements, the payment pursuant to clause 4 below, in the amount of US$7,694,100 guaranteed by the aggregate of the following collateral totaling US$8,261,000:
>
> (i) US$1,811,000 from the Presale Agreements.
>
> (ii) US$2,850,000 from the BOI Letter of Credit.
>
> (iii) US$3,600,000 in the form of an irrevocable assignment from the Service Providers to [Cinezeta] for US$3,600,000 worth of tax credits along with a letter from Wolrige Mahon Chartered Accountants and the Saskatchewan government confirming the amount of tax credits.

---

[1]To the extent any of these facts are disputed, they are not material to the disposition of this motion. In addition, to the extent that the Court has relied on evidence to which the parties have objected, the Court has considered and overruled those objections. As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relied on by the Court.

> (iv) any shortfall from (i), (ii) or (iii) above shall be covered by a corporate guarantee from [Distribution] in favour of [Cinezeta].  Such Sales Guarantee shall be applied by [Cinezeta] towards recoupment of the budgeted cost of the Picture on the terms and subject to the conditions of this Agreement including the Approved Recoupment Schedule and the terms of the Collection Agreement.

Joint Exhibit List Re: Plaintiff's Motion for Summary for Partial Summary Judgment ("Plaintiff's Exhibit"), Exhibit 15.  The amount of the Sales Guarantee is subject to reduction only by: (1) payments received by Cinezeta pursuant to the Approved Recoupment Schedule for the Picture (the "waterfall" payments) from a general Collection Account established pursuant to the Agreements, and (2) any other payments from the Picture received directly by Cinezeta.  *See* Plaintiff's Exhibit 15 at § 4.3.

Cinezeta also entered into an Assignment of Tax Credits Agreement ("Assignment"), dated October 25, 2004 with the Service Providers, which assigned the right to the tax credits, listed as collateral for the Sales Guarantee, to Cinezeta.  The Assignment provided in relevant part:

> [T]he parties agree as follows:
>
> 1. <u>Assignment</u>: Mooseface and JFP hereby irrevocably and unconditionally assign to Cinezeta the Tax Credits.
>
> 2. <u>Repayment</u>: Cinezeta acknowledges and agrees that its receipt of the Tax Credits shall be used to reduce the Tax Credit Guarantee as defined in the [Production] Guarantee Agreement.

Plaintiff's Exhibit 18.

### B.   Performance Under the Agreements

Production of the Picture began on or about January 10, 2005, and was completed on or about March 3, 2005.  The picture was released in over 20 international territories beginning in or about December 2005.

None of the funds listed as collateral for the Sales Guarantee ever materialized. The funds from the Presale Agreements were never paid to Cinezeta,[2] the BOI Letter of credit was never issued, and Cinezeta has never received any payment in connection with the Canadian tax credits. To date, Cinezeta has received three waterfall payments related to the Picture totaling $4,266,182.56, thereby reducing the amount of the Sales Guarantee to $3,427,917.44.  Cinezeta has received no other payments related to the Picture from the Collection Account or from any other source.  Distribution refused to pay the shortfall of $3,427,917.44 before, on, or after the Payment Date.

---

[2] Distribution paid the funds into the general Collection Account rather than directly to Cinezeta.

Although the right to the tax credits was assigned to Cinezeta, the money received from the tax credits was paid to the Service Providers rather than to Cinezeta.  Unfortunately, Bill Vince, principal of the Service Providers, absconded with the money received from the Canadian government for the tax credits.  Cinezeta has been unsuccessful in its efforts to recover these funds, and, to date, Cinezeta has not received any payments from or on account of the Canadian tax credits.

### C.     This Action

On December 27, 2010, Cinezeta filed this action against Defendants[3] alleging the following claims for relief: (1) breach of a written contract; and (2) fraudulent transfer.    Cinezeta moves for partial summary judgment on its claim for breach of a written contract. Defendants move for summary judgment on both of Cinezeta's claims for relief.

## II.     LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party meets its burden, a party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but must set out specific facts showing a genuine issue for trial. *Id.* at 250; Fed. R. Civ. P. 56(c), (e); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.").  In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the case."  *American International Group, Inc. v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991) (Kozinski, dissenting).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party.  *Anderson*, 477 U.S. at 248. "This requires evidence, not speculation."  *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1225 (9th Cir. 1999).  The Court must assume the truth of direct evidence set forth by the opposing party.  *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).  However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom.  *See Anderson*, 477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631-32 (9th Cir. 1987).  Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party." *American International Group*, 926 F.2d at 836-37.  In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the

---

[3]Cinezeta claims that International should be liable as the alter ego of Distribution.

nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

### III. DISCUSSION

#### A. Breach of Contract Claim Against Distribution

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis West Realty, LLC v. Goldman*, 41 Cal.4th 811, 821 (2011).  In this action, the only contested elements are whether Distribution breached the Agreements, whether Cinezeta performed under the Agreements, and the amount of damages.

##### 1. Distribution's Breach

Cinezeta claims that, pursuant to the clear language of the Agreements and Assignment, Distribution breached the Agreements by failing to pay the full amount due under the Sales Guarantee by the Payment Date of January 10, 2008.  Distribution claims that the Agreements, Assignment, and extrinsic evidence support the following contrary interpretation: (1) the assignment of the tax credits to Cinezeta immediately reduced the amount due under the Sales Guarantee by $3,600,000; and (2) it was not required to pay the Sales Guarantee by the Payment Date of January 10, 2008.

"The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." *Morey v. Vanucci*, 64 Cal. App. 4th 904, 912 (1998) (quoting *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992)). "The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties." *Id.*

Where the parties disagree about the meaning of a contract, the Court must construe the contract using a two step process. *Curry v. Moody*, 40 Cal. App. 4th 1547, 1552 (1995).  First, the Court must determine whether the contract is ambiguous. *Id.*  Whether the contract is ambiguous is a question of law. *ASP Properties Group v. Fard, Inc.*, 133 Cal. App. 4th 1257, 1266-67 (2005). If the language of the contract cannot reasonably be construed as a party suggests, the Court will find the contract is not ambiguous and the inquiry is over. *Id.* at 1267.  If, on the other hand, the Court finds that the contract is "reasonably susceptible to either of the meanings urged by the parties," then the Court "moves on to the second step which is to determine just what the parties intended the contract term to mean." *Curry*, 40 Cal. App. 4th at 1552.

In the second step, the Court admits the relevant evidence, if any, proffered by each party to aid in interpreting the contract. *Id.*  Although extrinsic evidence is generally prohibited "to vary, alter or add to the terms of an integrated written instrument" (*Morey*, 64 Cal. App 4th at 913 fn. 4), "[t]he test of admissibility  of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably

susceptible." *Pacific Gas & Elec. Co. v. Thams Drayage & Rigging Co.*, 69 Cal. 2d 33, 37 (1968).

If the parties submit no extrinsic evidence or if the material evidence is not in conflict, the Court's construction of the contract is purely a question of law. *ASP Properties*, 133 Cal. App. 4th at 1267. If, however, the evidence presents a genuine issue of material fact, that factual issue must be resolved by a jury. *National Union Fire Co. of Pittsburgh, Pa v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983).

The Court concludes, as a matter of law, that the Agreements and Assignment are unambiguous, and that (1) the assignment of the tax credits to Cinezeta did not immediately reduce the amount due under the Sales Guarantee, and (2) Distribution was required to pay the Sales Guarantee by the Payment Date of January 10, 2008. Even after considering the extrinsic evidence offered by the Defendants, the Court concludes that the Agreements and Assignment cannot be reasonably construed as Distribution suggests. Accordingly, because Distribution did not pay the Sales Guarantee on or before the Payment Date, it has materially breached the Agreements.

### a. The Assignment of the Tax Credits to Cinezeta did not reduce the amount due under the Sales Guarantee.

The Court concludes that, based on the clear language of the Agreements, the assignment of the tax credits to Cinezeta did not immediately reduce the Sales Guarantee by $3,600,000, and rejects the Defendants' contrary interpretation of the Agreements. Indeed, under the Production Guarantee Agreement, three items were designated as "collateral" for the Sales Guarantee, including "US$3,600,000 in the form of an irrevocable assignment from the Service Providers to [Cinezeta] for US$3,600,000 worth of tax credits along with a letter from Wolrige Mahon Chartered Accountants and the Saskatchewan government confirming the amount of tax credits." Plaintiff's Exhibit 15. "Collateral" is defined by Black's Law Dictionary as "[p]roperty that is pledged as security against a debt." Bryan A. Garner, *Black's Law Dictionary* (8th ed. 1999). Thus, the Court concludes that the irrevocable Assignment from the Service Providers was solely pledged as security for Distribution's obligation under the Sales Guarantee. The Assignment itself did not constitute payment or immediately reduce the amount due under the Sales Guarantee.[4]

The language of the Assignment supports the Court's interpretation. The Assignment specifically provides that: "Cinezeta acknowledges that its *receipt* of the Tax Credits *shall be* used to reduce the Tax Credit Guarantee as defined in the Guarantee Agreement." Plaintiff's Exhibit 18 (emphasis added). Accordingly, there would be no reduction of the amount due under the Sales Guarantee, unless and until Cinezeta actually *received* the Tax Credits. Indeed, the Production Guarantee Agreement provides that the only ways the amount of the Sales Guarantee can be reduced are from the waterfall payments or from any payments received directly by Cinezeta. Plaintiff's Exhibit 15 at § 4.3. It is undisputed that, as of this date, Cinezeta has not received any payment on account of the tax credits, and therefore that the amount due under the Sales

---

[4] Indeed, the $3,600,000 was merely an estimate of the tax credits potentially available, not the amount actually received. It would be counterintuitive to reduce the amount due under the Sales Guarantee based on a mere estimate prepared at the time of the Assignment.

Guarantee is $3,427,917.44.

In their Agreements, the parties made an express and reasonable allocation that Distribution would be responsible for payment of the entire amount due under Sales Guarantee in the event the funds from the "collateral" were insufficient to cover the Sales Guarantee: "[a]ny shortfall from (i), (ii) or (iii) above shall be covered by a corporate guarantee from [Distribution] in favor of [Cinezeta]."  Plaintiff's Exhibit 15.  Because Distribution "unconditionally and irrevocably" guaranteed that it would pay the Sales Guarantee in the event of a shortfall from the collateral, it is liable for the shortfall - $3,427,917.44.

### b. Distribution was required to pay the Sales Guarantee by the Payment Date of January 10, 2008.

Based on the plain language of the Agreements, the Court also concludes that Distribution was required to pay the Sales Guarantee by the Payment Date of January 10, 2008, and that Distribution's failure to do so constitutes a material breach of the Agreements.

The Payment Date is clearly specified in the definitions section of the Production Guarantee Agreement as January 10, 2008.  Plaintiff's Exhibit 15 at § 1.1 (defining "Payment Date" as "the date which is 3 years after the first day of principal photography of the Picture, which is January 10, 2008.").  Although the Court agrees that there are no specific provisions in the Agreements that provide "Distribution shall pay the Sales Guarantee by the Payment Date," the Payment Date is only mentioned in connection with, and only relevant to, the Sales Guarantee, and not to any other provisions of the Production Guarantee Agreement.  Moreover, in order to give effect to the "waterfall" provisions of the Approved Recoupment Schedule, Distribution was required to pay the amount due under the Sales Guarantee by the Payment Date:

> All Collected Gross Receipts shall be disbursed in the following manner and order on a continuous basis . . . .
>
> Fifth: from 100% of all Collected Gross receipts remaining after the deductions in (1) through (4) above until the liability of the [Distribution] under the Sales Guarantee has been extinguished or until [Distribution] has recouped all sums paid by it pursuant to the Sales Guarantee:
>
>     (a) if payable by the Collection Agent prior to the Payment Date, 100% shall be paid to [Cinezeta] provided that the [Distribution's] obligation to make payment under the Sales Guarantee shall be reduced dollar-by-dollar by the amount paid to [Cinezeta] hereunder; or
>
>     (b) if payable by the Collection Agent after the Payment Date, and only to the extent the Sales Guarantee has been paid by [Distribution] in full 100% shall be paid to [Distribution] to recoup those specific amounts of the Sales Guarantee paid to [Cinezeta] by [Distribution] after reduction pursuant to paragraph 5(a) above.

Plaintiff's Exhibit 15 at Schedule F.

In other words, before the Payment Date, Cinezeta would receive 100% of the Collected Gross Receipts, which would reduce the amount due under the Sales Guarantee. After the Payment Date, Distribution would receive 100% of the Collected Gross Receipts, until Distribution recouped the amount it paid under the Sales Guarantee. Clearly, in order for this provision to be meaningful, Distribution was required to pay the entire amount due under the Sales Guarantee by the Payment Date. Otherwise, there would be nothing for Distribution to recoup. Accordingly, the Court concludes that the Agreements required Distribution to pay the amount due under the Sales Guarantee by the Payment Date.

Distribution claims that failure to pay the Sales Guarantee on the Payment Date does not constitute a breach of contract, because it is not listed as an Event of Default in the Production Guarantee Agreement. However, this is simply not true. Section 4.3 of the Production Guarantee Agreement expressly provides that Distribution's obligation to pay the Sales Guarantee is a "material portion of the consideration due and owing to [Cinezeta]." Plaintiff's Exhibit 15 at § 4.3. Accordingly, the Court concludes that Distribution's breach of its obligation to pay the Sales Guarantee constitutes an Event of Default under the Production Guarantee Agreement. *See* Plaintiff's Exhibit 15 at § 9.1.1 (an event of default occurs if "[Distribution] materially breaches any of the terms hereof which breach . . . is not remedied within 21 days of the receipt by such party of a written notice from [Cinezeta] . . . .").

Distribution also claims that Cinezeta's *only* remedy for Distribution's failure to pay the Sales Guarantee by the Payment Date is termination of the Sales Agency Agreement, relying on the following language in the Production Guarantee Agreement: "[Distribution] hereby irrevocably agrees that in the event the Sales Guarantee is not paid by the Payment Date in accordance with the terms of this Agreement and the Relevant Agreements, then, [Cinezeta] may, at its election, terminate the Sales Agency Agreements by notice." Plaintiff's Exhibit 15 at § 4.5. While it is true that Cinezeta had the right to terminate the Sales Agency Agreement in the event of non-payment of the Sales Guarantee, the Production Agreement does not limit Cinezeta's remedy to termination.

Accordingly, the Court concludes that Distribution was required to pay the Sales Guarantee by the Payment Date of January 10, 2008, and that Distribution's failure to do so constitutes a material breach of the Agreements.

      2.    <u>Cinezeta's performance under the Agreements</u>

Defendants argue that Cinezeta cannot prevail on its breach of contract claim because Cinezeta failed to perform its obligations under the Agreements. Specifically, Defendants argue that Cinezeta did not satisfy its "Delivery" obligations under the Agreements.

Pursuant to the Production Guaranty Agreement, Distribution's obligation to pay the Sales Guarantee is "subject to the production and delivery of the Picture to [Distribution] in accordance with the Relevant Agreements." Plaintiff's Exhibit 15. Under the Sales Agency Agreement, "delivery" means delivery to the location specified by [Distribution] and technical acceptance by [Distribution] of all items listed on Schedule 'A' (each a 'Delivery Item') . . . ." Plaintiff's Exhibit 16. Delivery under the Agreements was required to be completed by November 30, 2005. James Seibel, managing member of Distribution, states in his declaration that Distribution has still not

received all of the elements listed in Schedule A of the Sales Agency Agreement. However, the Sales Agency Agreement expressly provides:

> [Distribution] shall have thirty (30) days from receipt of each Delivery Item to review each such item and if it is not technically acceptable to so advise [Cinezeta] in writing who, if the Delivery item is not technically acceptable shall correct or replace such item within a reasonable time period, given the nature of the defect.

Plaintiff's Exhibit 16. There is no evidence that Distribution ever directly advised Cinezeta in writing of any defects in delivery within thirty days of delivery of the Picture as required by the Agreements, and Distribution has released and distributed the Picture continuously for over five and a half years. Although Defendants have produced vague emails which discuss unspecified issues with delivery, these emails were not sent to Cinezeta and were sent more than thirty days after the date set for delivery of the Picture. These emails do not satisfy the written notice provision of the Sales Agency Agreement.

Accordingly, the Court concludes that Cinezeta performed its obligations under the Agreements, and that Distribution's obligation to pay the Sales Guarantee is not excused.

### 3.   The amount of damages

The Sales Guarantee, or shortfall in collateral, amounts to $3,427,917.44. Cinezeta argues that it is also entitled to prejudgment interest accruing from the Payment Date of January 10, 2008. Defendants claim that Cinezeta is not entitled to interest accruing from January 10, 2008, because Cinezeta did not give written notice of the breach until December 14, 2010. The Court agrees. Cal. Civ. Code § 3287(a) provides:

> Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . . . .

Pursuant to the Production Guarantee Agreement, the Event of Default at issue did not occur until 21 days after Distribution received written notice from Cinezeta specifying the breach and the steps reasonably required to remedy the breach. Plaintiff's Exhibit 15 at § 9.1.1. Accordingly, Cinezeta was not entitled to recover damages for Distribution's breach until 21 days after Distribution received written notice of the breach. It is undisputed that Cinezeta did not give written notice of the breach until December 14, 2010. Thus, Cinezeta is only entitled to prejudgment interest accruing from January 4, 2011.

The Court concludes that the balance of Defendants' arguments related to the breach of contract claim against Distribution are meritless and fail to raise a genuine issue of material fact. Accordingly, Cinezeta's Motion for Partial Summary Judgment as to its First Claim for Relief against Distribution is **GRANTED.** Defendants' Motion for Summary Judgment as to the breach of contract claim against Distribution is **DENIED.**

### B.      Alter Ego Theory Against International

The Court concludes that there are genuine issues of material fact as to Cinezeta's alter ego theory against International, precluding the Court from granting summary judgment. Accordingly, the parties' motions for summary judgment are **DENIED** as to the breach of contract claim against International.

### C.      Fraudulent Conveyance Claim

The Court also concludes that there are genuine issues of material fact with respect to Cinezeta's fraudulent conveyance claim, precluding the Court from granting summary judgment. Accordingly, Defendants' motion for summary judgment is denied as to the fraudulent conveyance claim.[5]

## IV.      CONCLUSION

For the foregoing reasons, Cinezeta's Motion for Partial Summary Judgment as to its First Claim for Relief Against All Defendants is **GRANTED in part, DENIED in part.** Cinezeta's Motion for Partial Summary Judgment as to its First Claim for Relief against Distribution is **GRANTED**; Cinezeta's Motion for Partial Summary Judgment as to its First Claim for Relief against International is **DENIED.**

Defendants' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment is **DENIED.**

IT IS SO ORDERED.

---

[5] In its opposition to Defendants' motion for summary judgment, Cinezeta requests a continuance under Fed. R. Civ. P. 56(d) to seek further discovery. Pursuant to Fed. R. Civ. P. 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment], the court may . . . defer considering the motion or deny it; [ ] allow time to obtain affidavits or declarations or to take discovery; or [ ] issue any other appropriate order." Fed. R. Civ. P. 56(d). Cinezeta has had sufficient opportunity to seek discovery on its fraudulent conveyance claim, and discovery is now closed. Accordingly, Cinezeta's request pursuant to Fed. R. Civ. P. 56(d) is **DENIED.**