UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Cinezeta Internationale Filmproduktionsgesellschaft mbH & Co 1. Beteiligungs KG, | ) ) ) ) | Case No. **CV 10-9938-JFW (FMOx)** |
| | ) ) | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| Inferno Distribution, LLC; Inferno International, LLC, | ) ) ) | |
| Defendants. | ) ) | |

## I.    PROCEDURAL BACKGROUND AND HISTORY

On December 27, 2010, Plaintiff Cinezeta Internationale Filmproduktionsgesellschaft mbH & Co 1. Beteiligungs KG ("Cinezeta" or "Plaintiff") filed this action against Defendants Inferno Distribution, LLC ("Distribution") and Inferno International, LLC ("International") (collectively, "Defendants"), alleging the following claims for relief: (1) breach of a written contract; and (2) fraudulent transfer. Plaintiff's first claim for relief for breach of contact

against International is based on the theory that International is the alter ego of Distribution.

On October 24, 2011, the Court granted a motion for partial summary judgment in favor of Plaintiff on the breach of contract claim against Distribution, but concluded that there were genuine issues of material fact as to Plaintiff's breach of contract claim against International as the alter ego of Distribution and as to Plaintiff's fraudulent transfer claim. [Docket No. 171].

In the Pre-Trial Conference Order lodged on November 7, 2011 [Docket No. 213], the parties could not agree on whether the alter ego claim should be decided by the Court or a jury. As a result, the Court ordered the parties to brief the issue and on November 23, 2011, the parties filed simultaneous briefs [Docket Nos. 225 & 234].

In light of the apparent conflicting case law as to whether alter ego is properly determined by a judge or jury and the fact that parties had demanded a jury trial on the Plaintiff's fraudulent transfer claim for relief, the Court concluded it would be both appropriate and beneficial and would not prejudice either party if the Court allowed the jury to decide the alter ego claim and thereafter, the Court would independently decide the alter ego claim and issue Findings of Fact and Conclusions of Law under Federal Rule of Civil Procedure 52.

Based on the foregoing, Plaintiff's first claim for relief for breach of contact against International as the / / /

alter ego of Distribution came on for trial on December 6, 2011.

On December 12, 2011, the jury returned its verdict, finding that International is the alter ego of Distribution.

On December 19, 2011, the parties each filed their proposed post-trial Findings of Fact & Conclusions of Law. On December 27, 2011, the parties filed their marked copies of the opposing parties' proposed post-trial Findings of Fact & Conclusions of Law pursuant to the Court's Scheduling and Case Management Order.

Accordingly, to the extent the determination of whether International is the alter ego of Distribution should be determined by the Court instead of the jury, and after considering the evidence, briefs and argument of counsel, the Court makes the following findings of fact and conclusions of law:[1]

## II.   FINDINGS OF FACT

### Witness Credibility

1.   Consistent with the jury's verdict on the alter ego theory, the Court finds that the testimony of Mr. Andrew Mann & Dr. Florian Lechner was both credible and persuasive and to the extent Mr. Mann's or Dr. Lechner's testimony was inconsistent or differed with the testimony of other witnesses at trial, the Court accepts the testimony of Mr. Mann and Dr. Lechner.

---

[1] Any finding of fact that constitutes a conclusion of law is also hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

2.   The Court finds that although Mr. Mann was obviously upset about Distribution's failure to pay him the money he believed was due from Distribution and/or International and that he was involved in litigation with Distribution and therefore biased, the Court finds that this bias did not undermine his credibility.  Moreover, because he was intimately familiar with the financial records of Distribution and International as the CFO of the companies, the Court finds that his testimony in explaining financial records, the transaction records, and the absence of financial transactions in those records produced by Defendants, was credible, helpful to the trier or fact, and very persuasive.

3.   As to the testimony of Dr. Lechner, although Dr. Lechner is the managing director of Cine Pictures Management GmbH, he is in effect simply an employee of Cinezeta and in his capacity as an employee had the responsibility to attempt to collect the obligation at issue in this case.  Dr. Lechner has no personal financial interest in the outcome of this action and whatever bias resulted from his employment relationship was minimal and did not have any effect whatsoever on his credibility.  The Court specifically finds the testimony of Dr. Lechner credible as to what occurred during the May 2008 meeting between Mr. Seibel and Dr. Lechner and finds Mr. Seibel did in fact make the statement to Dr. Lechner that if Cinezeta persisted in its attempts to collect the sales guarantee, Mr. Seibel would start a new corporation or company and drain the assets of Distribution

so that Cinezeta would not be able to collect the sales guarantee from Distribution.

4.   As to the testimony of Mr. James Seibel, the Court finds that Mr. Seibel's testimony was not credible on several major contested issues, including the May 2008 discussion with Dr. Lechner.  Specifically, Mr. Seibel was obviously biased and his testimony was evasive in many areas.  For example, Mr. Seibel had difficulty in identifying which of his ten employees worked for Distribution and International, which companies paid which employees, in explaining certain of the transactions in the financial records, and in remembering the compensation that he was paid by Distribution and International in 2008.

Alter ego findings

5.   Distribution is a California limited liability company created on or about November 14, 2002.

6.   International is a California limited liability company created on or about April 2, 2008.

7.   As California limited liability companies, neither Distribution nor International issue stock.

8.   International was formed with a $100 initial capital contribution from the members.

9.   International had no preexisting library of films, intellectual property rights, or other intangible assets when International was formed.

10.   International was not adequately capitalized.

/ / /

/ / /

11.   Distribution and International engage in the same business enterprise and have the same business purpose - namely sales and distribution of motion pictures.

12.   International has not engaged in music publishing activities, except as incidental to its films, and there is no distinction between International and Distribution regarding their engagement in music publishing activities.

13.   Mr. Seibel is managing member of both International and Distribution.

14.   Mr. Seibel is an owner of both International and Distribution.

15.   Mr. Bill Johnson is a managing member of both International and Distribution.

16.   Mr. Johnson is an owner of both International and Distribution.

17.   Until at least August 2010, Mr. Mann was the CFO of both International and Distribution.

18.   With the exception of Mr. Mann, the mangers of International and Distribution are identical.

19.   Mr. Seibel and Mr. Johnson are the sole and equal owners of Distribution.

20.   Mr. Seibel and Mr. Johnson are each 45% owners of International.

21.   Mr. Mann is a 10% owner of International.

22.   When International was formed in April 2008, Mr. Mann was a 10% owner of International.

23.   On or about August 7, 2008, Mr. Mann's interest in International was reduced to 5%.

6

24.   Mr. Mann was not compensated for the August 7, 2008 decrease in his interest to 5%.

25.   Mr. Mann's share in International was increased to 10% on December 31, 2008.

26.   Mr. Mann did not pay any additional consideration for the December 31, 2008 increase in his interest to 10%.

27.   Mr. Mann has not received any distributions as an owner of International.

28.   Mr. Mann has not received any annual or quarterly member reports from International.

29.   International did not hold shareholder or member meetings.

30.   International did not prepare any shareholder or member meeting minutes.

31.   International did not maintain minutes or adequate corporate records.

32.   On or about August 7, 2008, Mr. James MacLean was added as 5% owner of International.

33.   On December 31, 2008, Mr. MacLean's 5% share in International was eliminated.

34.   Mr. MacLean did not receive compensation relating to his ownership share in International.

35.   Mr. MacLean did not receive compensation for the elimination of his 5% share in International.

36.   Mr. Seibel and Mr. Johnson dominate and control both International and Distribution.

37.   Mr. Seibel and Mr. Johnson alone exercise supervision and management over both International and Distribution.

38. Distribution and International share offices, located at 1888 Century Park East, Suite 1540, Los Angeles, CA 90067.

39. Distribution and International share the same telephone number: 310-598-2550.

40. Distribution and International share the same fax number: 310-598-2551.

41. Distribution and International share desks, chairs and other office equipment.

42. Until at least August 2010, the rent for Distribution's and International's shared offices was paid by whichever company had the funds at the time.

43. Distribution and International share rent.

44. Distribution and International share utilities and other bills.

45. Distribution and International share the same website, www.infernodistribution.com.

46. There is no meaningful distinction on Defendants' shared website between Distribution and International.

47. Both Distribution and International are repeatedly branded and referred to on their shared website as simply "Inferno."

48. Defendants' shared website cultivates confusion between the two Defendants.

49. The films advertised on Defendants' shared website include both Distribution's films and International's films intermingled together without identification as to whether they are Distribution's films or International's films.

/ / /

8

50.   On the "Inferno Slate" page of Defendants' shared website, International's and Distribution's films are advertised without identifying which company owns the rights to which films.

51.   International's and Distribution's "Partners" and "Executives" are listed on Defendants' shared website without identification as to whether they are partners or executives of Distribution or of International or of both.

52.   Mr. Seibel and Mr. Johnson are listed on the "About Us" page of Defendants' shared website as "Partners" of "Inferno" without distinguishing between the two companies.

53.   Mr. Seibel is described on the "About Us" page of Defendants' shared website as "co-founder and Partner of Inferno" without distinguishing between the two companies.

54.   Seven persons (Kimberly Fox, Pamela Pickering, Philip J. Strina, Lesly Gross, Campbell McInnes, Gary Preisler and Orrin Halper) are listed on the "About Us" page of Defendants' shared website as "Inferno Executives" without distinguishing between the two companies.

55.   Five of the persons listed on the "About Us" page of Defendants' shared website as "Inferno Executives" that describe them joining "Inferno" or "the company" wihtout distinguishing which of the two companies they joined.

56.   The contact information on the "Contact Us" page of Defendants' shared website is listed as:

Inferno

1888 Century Park East

Suite 1540

Los Angeles, CA 90067

9

1    Phone: +1 (310)598-2550

2    Fax: +1 (310)598-2551

3    57. The "Company Overview" narrative on Defendants' shared

4    website is designed to cultivate confusion between the two

5    Defendants.

6    58. The "Company Overview" narrative on Defendants' shared

7    website does not distinguish between the two companies and refers

8    only to "Inferno."

9    59. The "Company Overview" narrative on Defendants' shared

10   website includes facts relating to both International and

11   Distribution without distinguishing which facts are relevant to

12   which company.

13   60. The "Company Overview" narrative on Defendants' website

14   states: "[s]ince launching its operation in 2002, Inferno has . .

15   . . ."

16   61. International did not exist in 2002 or at any time up

17   until April 2008.

18   62. The "Company Overview" narrative on Defendants' website

19   states:  "Inferno continues to pursue a full range of new

20   relationships and strategic alliances with financiers, independent

21   production companies, producers and studios."

22   63. Distribution has not taken on any new film projects

23   since International was formed in April of 2008.

24   64. Defendants' letterhead refers only to "Inferno," not to

25   Distribution or International.

26   65. Mr. Seibel testified that marketing and branding is an

27   important part of the business that he conducts.

28   / / /

66.   Mr. Seibel testified that he and his partner, Mr. Johnson, have marketed and branded themselves and their companies as simply "Inferno."

67.   After International was formed, the marketing of the two companies became more ambiguous and both were referred to as "Inferno Entertainment."

68.   Mr. Seibel testified that the name "Inferno" refers primarily to himself and his partner, Mr. Johnson, not to any particular company.

69.   Mr. Seibel testified that Defendants' website is a "marketing tool."

70.   Until his recent departure, Distribution and International shared in house legal counsel, Philip Strina.

71.   Distribution and International share outside legal counsel, Stroock & Stroock & Lavan.

72.   There are approximately ten personnel working for the Inferno companies in their shared offices.

73.   Mr. Seibel had difficulty identifying which personnel worked for which company.

74.   Mr. Seibel had difficulty identifying which personnel were paid by which company.

75.   During the past year, Philip Strina was compensated by both Distribution and International.

76.   During the past year, Philip Strina performed services for both Distribution and International.

77.   During the past year, Campbell McInnes was compensated by both Distribution and International.

/ / /

78.   During the past year, Campbell McInnes performed services for both Distribution and International.

79.   During the past year, Emily Friendship was compensated by both Distribution and International.

80.   During the past year, Emily Friendship performed services for both Distribution and International.

81.   During the past year, Pamela Pickering was compensated by both Distribution and International.

82.   During the past year, Pamela Pickering has performed services for both Distribution and International.

83.   During the past year, Lesley Gross was compensated by both Distribution and International.

84.   During the past year, Lesley Gross has performed services for both Distribution and International.

85.   During the past year, Mr. Johnson was compensated by both Distribution and International.

86.   During the past year, Mr. Johnson has performed services for both Distribution and International.

87.   During the past year, Mr. Seibel was compensated by both Distribution and International.

88.   During the past year, Mr. Seibel has performed services for both Distribution and International.

89.   Distribution and International share the same receptionist.

90.   Distribution and International share the same outside accountant, Mark Hutchison of Rothstein Kass.

/ / /

/ / /

91.   During the past year, the majority of the personnel in Defendants' shared offices have performed services for both Distribution and International.

92.   During the past year, the majority of the personnel in Defendants' shared offices have been paid by both Distribution and International.

93.   Distribution and International share employees.

94.   Defendants each used the corporate entity to procure labor and services for the other.

95.   Defendants each used the corporate entity to procure resources or merchandise for the other.

96.   A tax credit payment in the amount of $29,400 for one of Distribution's films, *Hachiko*, was paid to International.

97.   Distribution and International entered into inter-company revolving loans whereby either company could borrow funds from the other at any time.

98.   Mr. Seibel signed the revolving loans on behalf of both Distribution and International.

99.   Mr. Seibel was unaware of who, other than himself, negotiated the terms of the revolving loans on behalf of either Distribution or International.

100. Mr. Seibel was unaware of whether the revolving loans were reviewed by legal counsel on behalf of either Distribution or International.

101. Distribution and International's in-house legal counsel, Philip Strina, did not review the revolving loans or negotiate their terms.

/ / /

102. Pursuant to these revolving loans, Distribution could borrow up to $1,000,000 from International at any time.

103. Pursuant to these revolving loans, International could borrow up to $2,000,000 from Distribution at any time.

104. The purpose of these inter-company revolving loans was to permit the two companies to freely share their assets.

105. These inter-company loans are not arm's length.

106. In 2008, Distribution borrowed a total of $191,677.83 from International pursuant to these inter-company loans.

107. According to Distribution's financial ledgers for 2008, Mr. Seibel was paid $313,388.76 from Distribution in 2008.

108. According to Distribution's financial ledgers for 2008, Mr. Johnson was paid $186,862.36 from Distribution in 2008.

109. According to International's financial ledgers for 2008, Mr. Seibel was paid $22,173.27 from International in 2008.

110. According to International's financial ledgers for 2008, Mr. Johnson was paid $0.00 from International in 2008.

111. Mr. Seibel admitted that he received compensation from both International and Distribution, but claimed that he lacked knowledge regarding the amount of compensation he received from either company.

112. The borrowing of $191,677.83 by Distribution in 2008, while the vast majority (over $500,000) of Mr. Johnson's and Mr. Seibel's compensation in 2008 was paid by Distribution alone, was not arm's length.

113. International and Distribution have shared and commingled funds.

/ / /

14

114. Cinezeta and Distribution entered into a Production Guarantee Agreement ("PGA") effective December 1, 2004.

115. Cinezeta and Distribution entered into a Sales Agency Agreement ("SAA") effective August 30, 2004.

116. The PGA and SAA (collectively, the "Agreements") provide for the production and distribution of a motion picture entitled "*Just Friends*" (the "Picture").

117. Pursuant to the SAA, Distribution is the Sales Agent for the Picture in all territories other than the United States and Canada (and certain other related territories).

118. As Sales Agent for the Picture, Distribution was responsible for securing distributors for the Picture in the "Territory," as defined in the Agreements.

119. The SAA requires Distribution to pay all monies received in relation to the Picture into the Collection Account for the Picture within three (3) days of receiving such monies.

120. Mr. Seibel testified that the purpose of a Collection Account is to keep all parties honest with respect to payments derived from a film.

121. Between July 18, 2005 and September 30, 2010, Distribution received 24 payments totaling $376,892 related to the Picture that it did not pay into the Collection Account for the Picture.

122. Distribution did not report the 24 payments to Cinezeta until September 6, 2011, when it disclosed the 24 payments in its amended responses to Plaintiff's interrogatories served in this action.

/ / /

15

123. Distribution did not report the 24 payments to Cinezeta in its original responses to Plaintiff's interrogatories, which Distribution served on April 13, 2011.

124. Distribution concealed the 24 payments from Cinezeta until September 6, 2011.

125. Under the Agreements, Distribution agreed to pay Cinezeta a Sales Guarantee for the Picture.

126. By Order of October 24, 2011, the Court held that Distribution is liable to Cinezeta for breach of contract in the amount of $3,427,917.44 - representing the amount due under the Sales Guarantee - plus prejudgment interest accruing from January 4, 2011.

127. By Order of October 24, 2011, the Court held that pursuant to the Production Guarantee Agreement, Distribution was required to pay the amount due under the Sales Guarantee no later than January 10, 2008.

128. Distribution did not pay the amount due under the Sales Guarantee by January 10, 2008.

129. Distribution has never paid the amount due under the Sales Guarantee.

130. No evidence was presented at trial that Distribution has ever offered or promised to pay the amount due under the Sales Guarantee.

131. In February 2008, Dr. Lechner met with Mr. Seibel at the Berlin Film Festival.

132. At their February 2008 meeting, Dr. Lechner asked Mr. Seibel to pay the amount due under the Sales Gurantee.

/ / /

133. Mr. Seibel did not pay or offer to pay the Sales Guarantee at the February 2008 meeting, but instead told Dr. Lechner that he should attempt to collect the amount of the Sales Guarantee by pursuing collection of certain Canadian tax credits, rather than collecting the Sales Guarantee from Distribution.

134. In March 2008, Dr. Lechner again met with Mr. Seibel, this time at Mr. Seibel's offices in Los Angeles.

135. At their March 2008 meeting, Dr. Lechner again asked Mr. Seibel to pay the amount due under the Sales Guarantee.

136. Mr. Seibel did not pay or offer to pay the Sales Guarantee at the March 2008 meeting, but instead told Dr. Lechner that he should attempt to collect the amount of the Sales Guarantee by pursuing collection of certain Canadian tax credits, rather than collecting the Sales Guarantee from Distribution.

137. In May 2008, Dr. Lechner met with Mr. Seibel at the Cannes Film Festival.

138. At their May 2008 meeting Dr. Lechner again asked Mr. Seibel to pay the amount due under the Sales Guarantee.

139. Mr. Seibel did not pay or offer to pay the Sales Guarantee at the May 2008 meeting, but instead told Dr. Lechner that he should attempt to collect the amount of the Sales Guarantee by pursuing collection of certain Canadian tax credits, rather than collecting the Sales Guarantee from Distribution.

140. At the May 2008 meeting Mr. Seibel threatened that if Cinezeta persisted in its attempts to collect the Sales Guarantee, he would start a new company and drain the assets of Distribution so that Cinezeta would not be able to collect the Sales Guarantee from Distribution.

141. Mr. Seibel introduced Mr. Mann to Dr. Lechner during a meeting at Mr. Seibel's offices in early 2009 in order for Mr. Mann to assist in the collection of the Canadian tax credits.

142. Mr. Seibel or Mr. Johnson never informed Cinezeta of the existence of International.

143. Cinezeta was first informed of the existence of International in late 2010 by Mr. Mann.

144. Defendants concealed the existence of International from Cinezeta.

145. Defendants concealed the ownership, management and financial interests of International from Cinezeta.

146. After International was formed in April 2008, Distribution did not participate in the production, sale or distribution of any new films.

147. International did not have any preexisting library of films or other significant assets when it was formed in April 2008.

148. After International was formed in April 2008, all new film projects were placed in the new company, International.

149. International's first film, *King of Fighters*, was released sometime after November 2009.

150. International's financial ledgers show over $450,000 in accounts receivable for May 2008 alone - just one month after International was formed - including accounts receivable from *King of Fighters* and other films, including a film called *T.V. Set*.

151. Distribution's financial ledgers show numerous entries and payments related to *King of Fighters* in early 2008, including in March 2008, prior to the formation of International.

152. *King of Fighters* was in development at Distribution before International was formed.

153. Distribution's financial ledgers show numerous entries and payments related to *T.V. Set* in early 2008, including in March 2008, prior to the formation of International.

154. *T.V. Set* was in development at Distribution before International was formed.

155. All films generating accounts receivable in International's financial ledgers for May 2008, including *King of Fighters* and *T.V. Set*, were originated at Distribution.

156. All films generating accounts receivable in International's financial ledgers for the first six months after International was formed, including *King of Fighters* and *T.V. Set*, were originated at Distribution.

157. When International was formed in April 2008, all film projects in development at Distribution were transferred to International, including *King of Fighters* and *T.V. Set*.

158. There was no evidence presented at trial that any compensation was paid by International for the transfer to it of the film projects in development at Distribution, including *King of Fighters* and *T.V. Set*.

159. The transfer of the film projects in development at Distribution to International, including *King of Fighters* and *T.V. Set*, was not arm's length.

160. International and Distribution have shared assets, including transferring films in development at Distribution to International upon its formation.

161. International was a mere continuation of Distribution.

19

162. By August 2010, Distribution was a "dormant" company and was being "wound down."

163. The most recent Distribution film to be released is *Hachiko*, which was released in 2009.

164. The majority of revenue from Distribution's films came in between 12 and 14 months after the start of principal photography.

165. Revenues that might come in during the "second cycle" and "third cycle" of Distribution's films were considered insignificant by Distribution's management and were not figured into their cash flow projections for the films.

166. The only recent sales of *Just Friends* that Mr. Seibel or Mr. Johnson could identify were two sales of rights at AFM, which Mr. Seibel believed concerned distribution in Portugal and pay television rights in certain Asian territories.

167. Distribution had a significant infusion of cash in 2009 due to the refinancing of Distribution's revolving credit facility with D.B. Zwirn.

168. By 2010, the cash remaining from the 2009 D.B. Zwirn refinancing was no longer substantial, due in significant part to the payment of much of the cash infusion to Distribution's owners in member distributions.

169. Until Mr. Mann's departure in August 2010, the most significant revenue payment to Distribution in 2010 was a payment of approximately $700,000 and aside from this payment there were no other significant revenue payments to Distribution.

170. Distribution's cash flow and revenues were declining in 2010.

171. Distribution's cash flow and revenues are projected to continue to decline in 2010 and beyond.

172. The reason that Distribution's cash flow and revenues were declining in 2010 was that its only significant assets were rights in aging films, and that the revenues in those films were necessarily declining the older that the films became.

173. Distribution's only significant current assets are its library of old films.

174. As of August 2010, Distribution was not able to pay the Sales Guarantee.

175. Absent any significant infusion of new sources of revenue, Distribution's cash flow and revenues will continue to decline.

176. Absent any significant infusion of new sources of revenue, Distribution will continue to be unable to pay the Sales Guarantee.

177. International and Distribution have manipulated the assets and liabilities of the companies so as to concentrate the assets in International and the liabilities in Distribution.

178. The diversion of assets away from Distribution and toward International is to the detriment of the creditors of Distribution, including Cinezeta.

179. Mr. Seibel and Mr. Johnson have used International and Distribution as instrumentalities and conduits for a single venture or business.

180. Distribution is currently unable to pay the Sales Guarantee.

/ / /

181. It would be unjust to require Cinezeta to bear the risk that Distribution will be unable to pay the Sales Guarantee.

182. It would be unjust to allow Defendants to reap the benefits of holding themselves out to the public, to their business partners and to Cinezeta as one company, without requiring them to also be jointly responsible for the payment of the debt to Cinezeta.

183. There is such a unity of interest and ownership between International and Distribution that their separate personalities no longer exist.

184. Holding Distribution alone, and not International, liable for breach of contract would lead to an inequitable result.

## III.    CONCLUSIONS OF LAW

1.   "Alter ego is an extreme remedy, sparingly used." *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 539, 99 Cal. Rptr. 2d 824, 836 (2000); *see also Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 807 (9th Cir. 2002) ("We note that the alter ego rule is generally applied with caution.").

2.   "Ordinarily, a corporation is regarded as a legal entity separate and distinct from its stockholders, officers and directors.  Under the alter ego doctrine, however, where a corporation is used by an individual or individuals, or by another corporation, to perpetuate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, a court may disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation."  *Webber v. Inland Empire Invs.*, 74 Cal. App. 4th

/ / /

22

884, 900 (1999) (citing *Communist Party v. 522 Valencia, Inc.*, 35 Cal. App. 4th 980 (1995)).

3.   The alter ego doctrine is a limited doctrine "invoked only where recognition of the corporate form would work an injustice to a third person." *Webber*, 74 Cal. App. 4th at 900; *Zoran Corp. v. Chen*, 185 Cal. App. 4th 799, 810 (2010).

4.   The mere fact that one or two individuals own or control the stock structure of a corporation or that two corporations have common officers or directors, or both, does not mean that the two corporations may be regarded as the alter ego of each other.

5.   Based on the evidence presented at trial, there is more than an adequate basis for applying such a remedy to the present action.

6.   For the alter ego doctrine to be invoked, two elements must be met: (1) that there is such unity of interest and ownership between Distribution and International that their separate personalities no longer exist; and (2) that if the acts in question are treated as those of Distribution alone, an inequitable result will follow. *See Wady v. Provident Life & Accident Ins. Co.*, 216 F. Supp. 2d 1060, 1066 (C.D. Cal. 2002); *Flynt Distributing Co., Inc. v. Harvey*,(9th Cir. 1984).

7.   Both of these requirements must be found to exist before the corporate entity will be disregarded. *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 837-38 (1962).

8.   Plaintiff bears the burden of presenting evidence that overcomes the presumption of the separate existence of a corporate entity. *See Mid-Century Ins. Co. v. Gardner*, 9 Cal. App. 4th 1205, 1212 (1992).

23

9.   While no one factor is determinative of whether a company is the alter ego of another, the following are factors that may be considered in determining whether one corporation is the alter ego of another:

a)   commingling of funds and other assets; failure to segregate funds of the separate entities; and the unauthorized diversion of corporate funds or assets to other than corporate uses;

b)   the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities;

c)   the ownership of the two corporations by the same person(s) who dominate and control the two corporations, and the supervision and management of both companies by the same directors and officers;

d)   the use of the same office or business location;

e)   the employment of the same employees and/or attorney;

f)   the failure to adequately capitalize a company, the total absence of corporate assets, and undercapitalization;

g)   the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities;

h)   the disregard of legal formalities and the failure to maintain arm's length relationships among related entities;

i)   the use of the corporate entity to procure labor, services or merchandise for the other corporation;

/ / /

/ / /

24

j)   the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another;

k)   the formation and use of a corporation to transfer to it the existing liability of another entity;

l)   the holding out by one corporation that it is personally liable for the debts of the other corporation;

m)   the use of a corporation as a mere shell, instrumentality or conduit for a single venture;

n)   the diversion of assets from a corporation by or to an entity, to the detriment of creditors; and

o)   the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions.

*Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 838-40 (1962).

10.   The evidence at trial heavily weighs in favor of finding that International is the alter ego of Distribution.

12.   As set forth in the Court's findings of fact, Cinezeta has offered substantial evidence and sustained its burden of demonstrating, by a preponderance of the evidence, that International is the alter ego of Distribution.

13.   Cinezeta presented substantial evidence and sustained its burden by a preponderance of the evidence that Distribution and International have such a unity of interest that their separate corporate personalities do not exist.

/ / /

14.   Cinezeta presented substantial evidence and sustained its burden by a preponderance of the evidence that an inequitable result will follow if the acts are treated as those of Distribution alone.

15.   "Inequitable result" means that failure to disregard the corporate entity would sanction a fraud or promote injustice. *See, e.g.*, *Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1393 (9th Cir. 1984).

16.   "[B]ad faith in one form or another is an underlying consideration and will be found in some form or another in those cases wherein the trial court was justified in disregarding the corporate entity." *Oakland Meat Co.*, 210 Cal. App. 2d at 838.

17.   "[A]buse of the corporate privilege by itself does not require that a court disregard the separate identity of a corporation.  There must be some equitable purpose which will be served by ignoring the corporate form." *Wady*, 216 F. Supp. 2d at 1070 (citing *Shapoff v. Scull*, 222 Cal. App. 3d 1457, 1471 (1990)).

18.   "A court will pierce the corporate veil only when failure to do so 'would be to defeat the rights and equities of third persons.'" *Wady*, 216 F. Supp. 2d at 1070 (citing *Kohn v. Kohn*, 95 Cal. App. 2d 292 (1995)).

19.   "The inability of plaintiffs to recover for their losses is not a sufficient inequity to justify overlooking the corporate form." *Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1247 (N.D. Cal. 2004); *see also Seymour v. Hull & Moreland Eng'g*, 605 F. 2d 1105, 111 (9th Cir. 1979) (finding that an "inability to collect does not, by itself constitute an inequitable result").

20.   Cinezeta has not only established the first prong of the alter ego test, but has also established that an inequitable result (i.e. fraud or injustice) would follow absent piercing the corporate veil.

21.   Here, there is substantial evidence that Defendants engaged in conduct amounting to bad faith so as to justify disregarding the corporate form.   Specifically, Cinezeta has established that Defendants transferred or otherwise dissipated the assets of Distribution so as to render Distribution judgment proof and to unjustly prevent Cinezeta from recovering the $3,427,917.44 plus prejudgment interest from Distribution.

22.   The alter ego remedy was designed for a case such as this, and applying this remedy is both just and appropriate based on the evidence in this case.

## IV.   CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Court concludes that International is the alter ego of Distribution and that International is liable for breach of contract alleged by Cinezeta in its first claim for relief.


Dated: January 26, 2012

_____
JOHN F. WALTER
UNITED STATES DISTRICT JUDGE